**UNITED STATES of America,**

v.

**Issa M. JABER, Philip Momoh, Defendants.**

**No. CRIM.02–10201–NG.**

United States District Court, D. Massachusetts.

March 16, 2005 [1].

1. This is an amended version of the Memorandum and Order issued in this case on March 3, 2005. This Memorandum and Order replaces the prior version.

Michael C. Andrews, Law Offices of Michael C. Andrews, Boston, for Issa M. Jaber (1), Defendant.

John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, for Philip Momoh (2), Defendant.

Mark E. NeJame, Orlando, FL, for Issa M. Jaber (1), Defendant.

Susan M. Poswistilo, United States Attorney's Office, Boston, for USA Plaintiff.

Joan C. Stanley, Milton, for Issa M. Jaber (1), Defendant.

### AMENDED MEMORANDUM AND ORDER RE: SENTENCING UNDER UNITED STATES v. BOOKER

GERTNER, District Judge.

Issa Jaber ("Jaber") and Philip Momoh ("Momoh") were charged with conspiracy to possess or distribute pseudoephedrine, possession or distribution of pseudoephedrine with the knowledge that it would be used to manufacture a controlled substance, and conspiracy to commit money laundering. Jaber pled guilty to all counts of the indictment. Momoh, named only in four counts of the indictment, also pled guilty. Before I discuss their sentences, I address the applicable legal framework in light of *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

On January 12, 2005, the United States Supreme Court in *Booker* concluded that the Federal Sentencing Guidelines (hereinafter "Guidelines") were unconstitutional. The Court found that the Guidelines violated the Sixth Amendment because they

were not "guidelines" in any meaningful sense of the word. They obligated judges to find facts with specific consequences, consequences which were pre-ordained by the United States Sentencing Commission (hereinafter "Commission") and which increased a defendant's sentence beyond the range required by a jury's verdict or a plea of guilty. This constitutional defect required severance of the provisions of the Sentencing Reform Act of 1984 (hereinafter "SRA"), 28 U.S.C. § 994 et seq., 18 U.S.C. § 3551 et seq., that made the Guidelines mandatory, namely, 18 U.S.C. § 3553(b)(1).[2] The Guidelines are now to be deemed "advisory," such that courts are to "consider" Guidelines ranges, *see* § 3553(a)(4), but are permitted to tailor sentences in light of other statutory concerns. *See* § 3553(a); *Booker*, 125 S.Ct. at 757–69.

The *Booker* decision obliged many courts to reconsider individual sentences imposed under the mandatory regime. Cases before me, however, were in a somewhat different posture. The above-captioned defendants were among those sentenced by me between July 26, 2004, when I also concluded that the Guidelines were advisory in *United States v. Mueffelman*, 327 F.Supp.2d 79 (D.Mass.2004), and the present date. While I will review each case separately, in the light of my approach in *Mueffelman*, I do not believe that *Booker* necessitates reconsideration of any of these sentences.

At the same time, an "advisory" regime makes it all the more important that I adhere to my practice of writing opinions, outlining the reasons for the sentences I have imposed. As I describe in greater detail below, "advisory" does not mean a regime without rules, or a return to the standardless sentencing which preceded the SRA.[3] Nor does it mean slavish application of the Guidelines under the guise of fair "consideration," an approach which is now unconstitutional. "Advisory" means something in-between, which I articulate below.

The two defendants, Issa Jaber and Philip Momoh, whose cases constitute the subject of this opinion, are among those raising complicated sentencing questions.[4] I first present a framework for approaching sentencing after *Booker*, and then address the details of these defendants' individual cases.[5]

---

**2.** 18 U.S.C. § 3553(b)(1) provides:
(b) Application of guidelines in imposing a sentence.–
(1) In general.—Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described . . . .

**3.** *See* Marvin E. Frankel, *Criminal Sentences: Law Without Order* (1972).

**4.** Additional sentencing opinions will be issued shortly in other complex cases. As for other defendants sentenced by me after *Muef-*

*felman*, some of whom I refer to below, I have outlined carefully my reasons on the record, and in the appended public statements of reasons.

**5.** To be sure, these cases are not necessarily representative of the universe of cases I have heard in this period. In other instances, I have found that the Guidelines ranges *do* reflect § 3553(a) sentencing factors, or that statutory directives precluded any change from the Guidelines scheme. In *United States v. DeOliveira*, docket # 04–10016, the defendant was charged with mail fraud and impersonating an officer of the United States. Mr. DeOliveira preyed on numbers of illegal aliens, pretending to be a lawyer, or an immigration official, offering them the false hope that he could make them "legal." I heard from the victims about the money they had given him

## I.  *UNITED STATES v. BOOKER*

*Booker* was the culmination of a series of decisions, beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and ending with *Blakely v. Washington,* — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), in which the Court implicitly acknowledged a troubling pattern. Since the days of indeterminate sentencing, when a judge had unreviewable authority to sentence an offender anywhere within the statutory range, the pendulum had swung completely in the opposite direction. In fact, the term "guidelines" had become a misnomer. The Guidelines were rules, even "diktats," [6] mechanistically applied.

As the Second Circuit underscored in *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), it was the *mandatory* aspect of the Guideline regime that implicated the Sixth Amendment's requirement of a jury trial. The Court highlighted the following quote in *Booker*:

> We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. Indeed, everyone agrees that the constitutional issue presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges ... For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.

*Booker*, 125 S.Ct. at 750 (internal citations omitted).

The Supreme Court's rationale was clear: pre-guidelines, judges and juries each had specialized roles. Juries found facts, while judges exercised discretion—judgment—in imposing sentences. Jury decision-making was constrained by the rules of evidence and the highest burden of proof that could be imposed—beyond a reasonable doubt. Sentencing decisions were not so constrained. Judges could consider virtually all facts and circumstances about the offense and the offender. *See* 18 U.S.C. § 3661.

With mandatory rules, the roles began to blur. What the *judge* did mirrored precisely what the *jury* did—finding facts with determinate consequences, only in a setting with few procedural safeguards, and even less legitimacy.[7] As I noted in *Mueffelman:*

and the impact of this on their lives. The Guidelines range was entirely appropriate, implementing the purposes of § 3553(a).

**6.** Jose Cabranes & Kate Stith, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 95 (1998) [hereinafter Stith & Cabranes, *Fear of Judging* ] (describing Guidelines as a set of "administrative diktats" that the Commission "promulgated and enforced ipse dixit").

**7.** I have described this phenomenon in greater detail in Judge Nancy Gertner, *Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing*, 32 Suffolk U.L.Rev. 419 (1999) (arguing that as more and more significant issues were shifted away from the jury to the judge at sentencing, both

decision makers, rather than being specialists in their respective spheres, seemed to be doing exactly the same thing—finding facts with determinate consequences—but with very different procedural protections). Pre-guidelines, "the model of sentencing was a therapeutic one, with the goal of rehabilitating the offender. Each offense carried a broad range of penalties. Like a social worker or doctor, the judge exercised his or her clinical judgment to arrive at a sentence. In order to maximize the information available to the judge, and to minimize constraints on her discretion, sentencing procedures were less formal than trial procedures." *Id.* at 422. But however powerful the judge was, that power did not diminish the jury's role: "The judge was the expert at sentencing—the jury,

'guidance' turned to mandatory rules, mechanistically applied—if the judge finds 'x' fact (quantity, the amount of the fraud, for example), 'y' sentence is essentially compelled. More and more issues of consequence to the punishment of an offender were being pushed into the sentencing realm, with few safeguards. And to the degree that the judge's role was transformed to 'just' finding the facts, now with Commission-ordained consequences, what the *judge* was doing began to look precisely like what the *jury* was doing, only with fewer safeguards, less formality, and far less legitimacy. With respect to this area—fact-finding with determinate consequences—the judge had no specialized role, added no unique expertise to the process. The only difference—and it was a troubling one—was that judicial decision-making took place in what has been described graphically as the 'second string fact-finding process.'

*Mueffelman,* 327 F.Supp.2d 79, 83 n. 8 (internal citations omitted).

In *Booker*, the trial court followed the Guidelines, increasing the sentence range of 210–262 months (the range based on the facts implied by the jury's verdict) to 360 months to life (the range based on facts of the defendant's "relevant conduct," *see* U.S.S.G. § 1B1.3, as found by the judge). *See United States v. Booker*, 375 F.3d 508 (7th Cir.2004). In *Fanfan*, the applicable Guidelines range increased from 63–78 months to 188–235 months based on the sentencing judge's determination of relevant conduct. *See Fanfan v. United States*, 2004 WL 1723114 (D.Me. June 28,

2004). The judge, however, concluded that the Supreme Court's decision in *Blakely* precluded him from sentencing above the range dictated by the jury's verdict, and thus imposed a sentence of 78 months. *See id.*

The Supreme Court rejected both the former approach, which would have continued to blur the role of judge and jury, and the latter approach, which would have eliminated judicial enhancements while maintaining all other aspects of the Guidelines. The Court found that the constitutional jury trial requirement was not compatible with the SRA as written. Accordingly, the Court required that 18 U.S.C. § 3553(b)(1), which made the Guidelines mandatory, be "sever[ed] and excise[d]." 125 S.Ct. at 764.

Significantly, section 3553(a) remains, requiring a sentencing judge to "consider" a number of factors, including "the nature and circumstances of the offense, and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing court must also weigh the purposes of sentencing listed in the SRA, including the need for the sentence to "reflect the seriousness of the offense," deter future criminality, protect the public, and provide the defendant with needed training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a)(2)(A-D). The Guidelines and their policy statements are now factors to be weighed among the others.[8] Thus, a judge is also to consider:

(4) the kinds of sentence and the sentencing range established for—

---

at trial. Each was critically important in its sphere." *Id.* With mandatory Guidelines, the Commission supplanted—not supplemented—the judicial experts, whose work then began to tread on the jury's role.

**8.** Professor Freed suggested just such an interpretation of § 3553(a) over ten years ago. *See* Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers,* 101 Yale L.J. 1681, 1701–1702 (1992).

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
(i) issued by the Sentencing Commission. . . .
(5) any pertinent policy statement—
(A) issued by the Sentencing Commission. . . .

18 U.S.C. § 3553(a)(4, 5).[9]

The next question is, how is a judge to balance these factors in an advisory regime? What, precisely, does "advisory" mean?

### A. *The Advisory Framework*

One way to identify what is permissible in an advisory framework is first to identify what is impermissible. Sentencing approaches can now be tracked along a continuum. At one end lies the mandatory extreme. To the extent that judges enforce the federal sentencing guidelines without exercising any discretion, i.e., as if they are "mandatory," the *Blakely–Booker* line of cases suggest that judges are behaving in an unconstitutional manner. They are arrogating to themselves fact-finding decisions which appropriately belong to juries.

On the other end of the continuum is what I have come to describe as the "free at last" regime, or a return to pre–1984 indeterminate sentencing. Put another way, this end describes an approach to sentencing in which judges feel free to disagree about the fundamental premises of sentencing, to implement their own perceptions of what policies should drive punishment.[10] The "free at last" mentality is characterized by comments like, "I won't sentence according to the Guidelines because I simply don't agree that sale of marijuana deserves such severe penalties." [11]

Advisory guidelines should fall somewhere in-between these poles; they should constitute a regime based on rules of general application—what many have described as a common law of sentencing, supplementing, not supplanting, judges.[12]

---

**9.** In a number of decisions pre-*Booker*, I tried to apply § 3553(a) to give force to *all* of the listed factors, not simply to Guideline factors. *See e.g., United States v. Ribot*, 97 F.Supp.2d 74 (D.Mass.1999). I noted that, in order to determine whether departure from the Guidelines was warranted (as involving an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission," 18 U.S.C. 3553(b)), the Court must have "a perspective independent of the Guidelines—*all* the facts the case involves, and not just those facts made relevant by the Guidelines." *Id.* at 75 n. 2.

**10.** In fact, the prevalence of disagreements about the fundamental premises of punishment pre-Guidelines was overstated. *See* Stanton Wheeler, Kenneth Mann, & Austin Sarat, *Sitting in Judgment: The Sentencing of White Collar Criminals* 144–45 (1988).

**11.** In *United States v. Gonzalez*, No. 03–10027, the defendant plead guilty to illegal reentry after deportation and passing false social security cards. The applicable statute, 8 U.S.C. § 1326, already distinguished between defendants who had simply reentered the country, and those who did so after conviction of a crime. Mr. Gonzalez's reentry had not followed the conviction of a crime. Counsel did nothing to individualize Mr. Gonzalez (i.e., to suggest why he was different from all others in that category of offense). In my judgment, her argument translated into—"I don't agree that people who have committed these offenses ought be punished so severely." While I agreed with counsel's predilections, I rejected that approach. It was not a judgment for me to make, so I sentenced according to the Guidelines.

**12.** *See* Douglas A. Berman, *A Common Law For This Age of Federal Sentencing: The Opportunity and Need For Judicial Lawmaking*, 11 Stan. L. & Pol'y Rev. 93, 94 (1999) [hereinafter Berman, *Common Law*] (arguing that common law of departures could eventually emerge from appellate review of reasoned

To be sure, in this regime, the existing set of rules—the Guidelines—are very important, but they cannot be outcome-determinative without running afoul of *Booker.*

I agree with the Second Circuit in *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), that it is not useful to determine in advance the weight that sentencing judges should give to applicable Guidelines ranges. Rather, in *Crosby,* the Court concluded that it is "more consonant with the day to day role of district judges in imposing sentences and the episodic role of appellate judges in reviewing sentences ... to permit the concept of 'consideration' in the context of the applicable Guideline range to evolve...."[13] *Id.* at 113.

At the same time, I have concerns about the approach in *United States v. Wilson,* 350 F.Supp.2d 910 (D.Utah 2005) (*Wilson I*), and *United States v. Wilson,* 355 F.Supp.2d 1269 (D.Utah 2005) (*Wilson II*), adopted in *United States v. Wanning,* 354 F.Supp.2d 1056 (D.Neb.2005). In *Wilson,* the court noted that the Guidelines are entitled to "heavy" weight, and that deviation from Guidelines ranges is only appropriate in unusual cases, for clearly identified and persuasive reasons. *See Wilson,* 350 F.Supp.2d at 912.

I have concerns about such an approach, both as a matter of law and fact. As a practical matter, the *Wilson* method comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker.*[14] Guidelines ranges had always been the presumptive sentences, and perhaps became even more compulsory after the amendments of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today (PROTECT) Act. *See* Pub.L. No. 108–21, 117 Stat. 650, 667 (codified in scattered sections of 18 and 42 U.S.C., with the Feeney Amendment set forth in a note to 18 U.S.C. § 3553). Deviations from the Guidelines for certain facts were permitted only in "extraordinary" circumstances. In fact, departure authority was always framed in the terms used by the Court in *Wilson.*

Furthermore, I have concerns about the legal premises on which the *Wilson* approach is based. In *Wilson I* (reaffirmed in *Wilson II*), the Court noted that the Guidelines are entitled to "heavy" weight for a number of reasons: 1) they were promulgated by an "expert agency," 2)

departures); Marc Miller, *Purposes at Sentencing,* 66 S. Cal. L.Rev. 413, 419 (1992) [hereinafter Miller, *Purposes at Sentencing*] (criticizing the Sentencing Commission for failing to articulate a sentencing philosophy); Louis F. Oberdorfer, *Mandatory Sentencing: One Judge's Perspective—2002,* 40 Am.Crim. L.Rev. 11, 17–18 (2003) (arguing that the Guidelines are flawed and suggesting that a common law of sentencing would produce fairer penalties).

13. The Court outlined a few general principles and approaches to sentencing post-*Booker:* 1) the Guidelines are no longer mandatory, 2) sentencing judges are to consider them alongside all of the other factors in § 3553(a), 3) "consideration" of the Guidelines will normally require a determination of the applicable Guideline range and policy statements, 4) after considering the Guidelines and the factors in § 3553(a), the sentencing judge should decide whether to impose the sentence that would have been imposed under the Guidelines (meaning either a sentence within the range or within the permissible departure authority), or to impose a non-Guidelines sentence, and 5) the sentencing judge is entitled to find all facts appropriate for determining a Guidelines sentence or a non-Guidelines sentence. *See Crosby,* 397 F.3d at 113–14.

14. The Court in *United States v. Ranum,* 353 F.Supp.2d 984, 985–986 (2005), expressed similar concerns about the *Wilson* approach, holding that it "is inconsistent with the holdings of the merits majority in *Booker,* rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker,* directing courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore."

that expert agency promulgated "comprehensive guidelines", and 3) these Guidelines directly reflected the congressionally-mandated purposes of the SRA.[15] From the Court's perspective, there was nothing more a trial judge could do to effectuate the purposes of the statute in a given case than to impose the Guidelines sentence. The Commission, with Congress' concurrence, had done it all. As the *Wilson* court noted:

> It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect, and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes. The more likely conclusion is that the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes.

*Wilson*, 350 F.Supp.2d at 915.

Apart from congressional approval, the Court found that the Guidelines *in fact* achieved the statutory purposes: They achieved just punishment because they precisely reflected society's views about punishment, as described in the Commission's own studies, and they achieved the goal of deterrence, enumerated in § 3553(a), by their impact on crime rates. Crime rates, the Court noted, had declined since the inauguration of the Guidelines. Indeed, relative to the sentencing experts on the Commission, courts were poorly suited to consider "elasticities and other factors that would go into a sensible deterrence calculation," particularly with respect to classes of crimes. *Id.* at 920. In

contrast to the courts, "the Sentencing Commission with its ability to collect sentencing data, monitor crimes rates, and conduct statistical analyses, is perfectly situated to evaluate deterrence arguments." *Id.*

While I have considerable respect for the United States Sentencing Commission, and as the sentences below suggest, for the Guidelines it has promulgated, the Court in *Wilson* overstates the case for deference to the Commission, particularly in individual cases.

**1. The Guidelines Were Not in Fact, and Could Not Be, Comprehensive.** Under 28 U.S.C. § 991(b)(1), the Sentencing Commission was directed to establish policies that would "[a]void[ ] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct *while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.*" 28 U.S.C. § 991(b)(1)(B) (emphasis added). The original Commission recognized that its understanding of the factors that could legitimately affect sentencing was not exhaustive. In part, the Commission was limited by a regime in its preliminary stages. In part, and this is particularly relevant today, the Commission conceded the inherent complexity of the sentencing enterprise. It acknowledged "the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. I, pt. A, intro. cmt. 4(b). Indeed, it saw that "[c]ircumstances that may warrant departure

---

**15.** The *Wilson* court concluded that Congress had ratified each and every Guideline because it "had an opportunity both to review the initial Guidelines and all subsequent amendments to insure that they fulfill congressional purposes." *Wilson,* 350 F.Supp.2d at 915.

from the guideline range ... cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0(a) (prior to amendment). With few exceptions, the Commission refused to "limit the kind of factors (whether or not mentioned anywhere else in the Guidelines) that could constitute grounds for departure in an unusual case." U.S.S.G. ch. I, pt. A, intro. cmt. 4(b).

The Commission's concerns, and its approach, apply with particular force today after the Supreme Court's decision in *Booker.* From the start, the Guidelines were intended to advance both the goals of uniformity and proportionality. *See* U.S.S.G. ch. I, pt. A, intro. cmt. 3. Congress did not seek to impose a regime with absolutely uniform sentences across the country. It sought to eliminate only "unwarranted" disparities, while enabling judges to consider those factors that cannot be tallied in advance, but that may create "warranted" disparities in sentencing.[16]

Indeed, the drafters of the Guidelines regime envisioned an important role for judges in articulating what those factors might be. As judges applied the Guidelines, they were supposed to highlight issues and concerns that the Guidelines had not addressed, in effect, to create a common law of sentencing in the interstices of the Guidelines. As one scholar noted: "[t]he notion of judicial development of a 'common law of sentencing' was a fundamental component of the guidelines model which hoped to take advantage of 'the interlocking substantive lawmaking competencies of the commission and judiciary.'"[17] Berman, *Balanced and Purposeful Departures, supra* note 15, at 34; *see also* Kevin R. Reitz, *Sentencing Guideline Systems and Sentence Appeals: A Comparison of Federal and State Experiences,* 91 Nw. U.L.Rev. 1441, 1455 (1997). Judges were to articulate the purposes of sentencing, and to "consider what impact, if any, each particular purpose should have on the sentence in each case." S.Rep. No. 98–225, at 77 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260. In short, the drafters understood that fairness in the individual case meant something other than rote application of the Guidelines.

This approach is not only consistent with the SRA and the Guidelines, but also, I would argue, is now compelled by *Booker.* (Indeed, had the Guidelines been interpreted more consistently with this early vision, perhaps *Booker* would have had a different outcome.)

**2. The Guidelines Do Not Implement the Purposes of Sentencing.** Indeed, the Commission made no effort to implement

---

16. Kate Stith and Jose Cabranes described it as follows: "The overriding statutory directive to the Sentencing Commission was to eliminate 'unwarranted disparity.' The concept of disparity that is *unwarranted,* however, is intelligible only in the context of some accepted criteria for determining what disparity is *warranted*—that is, what factors should be taken into account in sentencing." Stith & Cabranes, *Fear of Judging, supra* note 5, at 51–52.

17. Through a "common law of sentencing" there would be a judicial contribution to the principled evolution of the guidelines system. "The initial drafting of the sentencing Guide-

lines would make certain policy determinations and set a course for the development of substantive sentencing rules. But then trial and appellate judges, through their articulation and review of reasons supporting decisions to depart from the guidelines in individual cases, would have their say in the evolution of principled and purposeful sentencing law and policy." Douglas A. Berman, *Balanced and Purposeful Departures: Fixing a Jurisprudence that Undermines the Federal Sentencing Guidelines,* 76 Notre Dame L.Rev. 21, 34 (2000) [hereinafter Berman, *Balanced and Purposeful Departures* ].

the statutory purposes of sentencing. The first Commission noted that choosing among purposes would be "difficult," that the selection of purposes was often "irrelevant," and that, therefore, it would simply not identify its purposes at all (or would claim that *all* purposes were relevant to all cases). Marc L. Miller, *Purposes at Sentencing, supra* note 11, at 424–25. In effect, the purposes enumerated under § 3553(a) became irrelevant to the Guideline enterprise. This is so even as the Guidelines have been amended over the years.[18]

**3. The Commission Has Not Functioned as a Sentencing Expert in the Way the Statute Envisioned.** The Commission's mandate was to develop Guidelines that "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). Moreover, it was to "develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2)." 28 U.S.C. § 991(b)(2). One can imagine these directives leading to scientific studies on the efficacy of different guidelines, how they relate to crime control objectives, to what extent they deter crime, or, to quote one judge, "what works." Judge Michael Marcus, *Archaic Sentencing Liturgy Sacrifices Public Safe-*

*ty: What's Wrong and How We Can Fix It,* 16 Fed. Sent. Rep. 76 (2003).

But, with few exceptions, the Commission has done no such analysis. Without an agreement on the purposes of sentencing, there was no way for the Commission to measure sentences against particular objectives.[19] Even after the Guidelines were promulgated, all discussions of delay for "field testing" were rebuffed. *Id.* at 58. Instead, the Commission simply took the average national sentences for a given offense, and then increased them, without explanation, much less scientific study.[20]

The Commission did not try to justify its Guidelines in any meaningful way either. It did not have to. Like other administrative agencies' rules, the Commission's proposed rules become law unless disapproved by Congress. *See infra* Part I.A.4. But, unlike other rule making agencies of the federal government, the Commission is not subject to the Administrative Procedure Act. Since the Guidelines could not be challenged as "arbitrary" or "capricious," the Commission faced no pressure to provide explanations. Stith & Cabranes, *Fear of Judging, supra* note 5, at 57; *see also* Joseph W. Luby, *Reigning in the Junior Varsity Congress: A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines,* 77 Wash. U. L.Q. 1199, 1221 (1999).

---

**18.** Indeed, the assumption that the Commission must have thought about purposes—when it did not—is responsible in part for the overly rigid enforcement of the Guidelines. *See* Paul J. Hofer & Mark Allenbaugh, *The Reason Behind the Rules: Finding and Using The Philosophy of the Federal Sentencing Guidelines,* 40 Am.Crim. L.Rev. 19, 22 (2003) ("Mechanical judging fails to subject the rules to the ongoing critical scrutiny needed when applying them to the particular circumstances of individual defendants.")

**19.** Stith and Cabranes concluded that this was the reason why "the Commission has never presented empirical evidence or substantial argument to support the proposition that its rules achieve, even imperfectly, any of the four well-established possible objectives of criminal sentencing—retribution, deterrence, incapacitation or rehabilitation." Stith & Cabranes, *Fear of Judging* (1998), *supra* note 5, at 53.

**20.** And even the data on which the averages were culled was problematic. *See* Stith & Cabranes, *Fear of Judging, supra* note 5, at 64.

**4. Congress Has Approved the Guidelines Generally—Not Their Use In Any Particular Case.** Proposed Guidelines become law unless disapproved by legislation. To disapprove a proposed guideline, Congress must pass a bill. If the president vetoes that bill, it can become law only by a two-thirds vote of both Houses of Congress. If Congress does not adopt disapproval legislation within 180 days, any Guideline becomes legally binding. *See* 28 U.S.C. § 994(a, p) (1994). It is no surprise that, with some exceptions, Congress has not played an active role in the promulgation of individual Guidelines.

**5. While the Guidelines May Reflect Public Opinion to a Degree, They Do Not Reflect the Public's View of Individual Cases.** In fact, the studies cited in *Wilson I* found that, while there was agreement between the Guidelines and the public in ranking crimes, the general consensus did not extend to the length of the sentence in an individual case, which is precisely the decision that judges have to make. As the authors note, "on the level of sentences given to individual vignettes, there was only a very modest amount of agreement between the sentences given by individual respondents and those prescribed by the guidelines." Peter H. Ross & Richard A. Berk, *Just Punishment: Federal Guidelines and Public Views Compared* 208 (1997). Moreover, there were "major departures" from "close agreement" with respect to crimes, such as drug trafficking, that the Commission had determined required lengthy sentences. In short, it is not at all clear that the public would agree with mechanistically-derived Guidelines outcomes, if it had all the information that judges possess, instead of just sound bytes or incendiary headlines.

**6. There Is Substantial Debate about the Role of the Federal Sentencing Guidelines in Crime Rate Reduction.** Even assuming that incarceration contributes heavily to the drop in crime, federal sentencing comprises only a fraction of the sentences meted out in courts around the country every year. In 2001, 59,363 defendants were convicted of felonies in federal court. *See* Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics Online ("Sourcebook Online"), Table 5.18, "Federal defendants convicted in U.S. District Courts" (fiscal year 2001), *available at* http://www.albany.edu/sourcebook/pdf/t518.pdf. In contrast, in 2000, fully 924,700 felony convictions took place in state courts. *See* Sourcebook Online, Table 5.44, "Felony convictions in State courts" (2000), *available at:* http://www.albany.edu/sourcebook/pdf/t544.pdf. Furthermore, state sentencing policies vary widely from federal sentencing policy. Some states have guideline systems, some do not, and others use hybrid structures.

Indeed, most studies attribute falling crime rates to factors other than incarceration rates, much less to the Federal Sentencing Guidelines. *See e.g.*, Henry Ruth & Kevin R. Reitz, *The Challenge of Crime: Rethinking Our Response* 5, 15–18 (2003). In fact, although drug offenders are incarcerated for longer and longer periods, the drug crime rate has increased. *See id.* at 211–214; *see also* Jeffrey A. Roth, *Review of an Analysis of Non–Violent Drug Offenders with Minimal Criminal Histories*, 7 Fed. Sent. Rep. 18, at 4–5 (1994).

But, having said all of the above, I have absolutely no doubt that, however one characterizes the Guidelines, their advantages and their flaws, the Guidelines will continue to play an important part in sentencing. They have shaped the vocabulary we use to describe sentences, and the standards we use to evaluate and compare cases. Since there were no alternative rules prior to the Sentencing Guidelines—

no empirical studies linking particular sentences to particular crime control objectives, no common law of sentencing—and there have been none since, the Guidelines will continue to have a critical impact. At the same time, as I describe below, the only way for courts to truly "consider" the Guidelines, rather than to follow them by rote, is to do in each case just what the Commission failed to do—to explain, correlate to the purposes of sentencing, cite to authoritative sources, and be subject to appellate review. As for the Commission, it can now return to what it was supposed to do as well—to studying the impact of sentences on crime control, as well as monitoring disparity. *See e.g.,* Barbara M. Vincent, *Research in Sentencing,* 6 Fed. Sent. Rep. 22 (1993).

In the final analysis, the SRA sought to eliminate "unwarranted disparity" between "similarly situated offenders." It did not call for *identical* sentences from one end of the country to another. Differences justified by "differences among offenses or offenders" are *warranted* differences. S.Rep. No. 98–225, at 38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221–29 ("Sentencing disparities that are not justified by differences among offenses or offenders are unfair both to offenders and to the public."). Differences in the treatment of offenders based on identifiable, sustainable standards, spelled out in decisions, statements of reasons, or transcripts, and subject to review, or even testing, are not "unwarranted."

The devil, however, is in the details to which I now turn. I begin a discussion of my two sentencing decisions in the cases of Issa Jaber and Philip Momoh with a review of the Guidelines—an effort to interpret them, to determine what factors each guideline comprised and, to the extent possible, why these factors are important. I then review the sentences that resulted with a view to the statutory purposes of sentencing. In my judgment, each of these sentences could be described as "Guidelines" sentences, as they hark back to the original statute and intended approach.[21]

## II. *ISSA JABER and PHILIP MOMOH*

Issa Jaber ("Jaber") and Philip Momoh ("Momoh") were charged in an eight count superceding indictment alleging conspiracy to possess or distribute a list I chemical, namely pseudoephedrine, in violation of 21 U.S.C. § 846 (Count 1), possession or distribution of a listed chemical knowing that it would be used to manufacture a controlled substance, in violation of 21 U.S.C. 841(c)(2) (Counts 2–7), and conspiracy to

---

**21.** Neither of these cases required that I take into account factors discouraged or prohibited under the Guidelines, although *Booker* anticipated such situations. *Booker* plainly allows courts to look carefully at those factors and to determine to what degree they are relevant to individual cases. For example, the Guidelines prohibit consideration of socioeconomic factors in determining a sentence. *See* U.S.S.G. § 5H1.10. In reconstructing the debate that raged around the Guidelines—not, of course, through Commission materials, since they provide little—it becomes clear that the rationale for such exclusion was this: Socioeconomic factors point in two directions at once, serving as both aggravating and mitigating factors. They can predict recidivism, as well as explain past behavior. However, if a judge has a case in which a socioeconomic factor points only in one direction, as a mitigating factor, he or she may well consider it (i.e., a socioeconomic factor that provides an explanation for past behavior without serving to predict recidivism because the defendant now has a more stable life and is therefore less likely to commit a crime again). That kind of analysis does not challenge the Guidelines per se, but only their application to individuals. In addition, *Booker* also suggests that judges may now do with the Guidelines what they have done with respect to other administrative regulations—determine whether they are consistent with the statutory mission.

commit money laundering, in violation of 18 U.S.C. § 1965(h) (Count 8). Jaber is named in all counts, to which he pled guilty. Momoh is named in Counts 1, 4, 7 and 8, to which he also pled guilty.

The nub of the offense according to the indictment was the charge that, from January 2000 until July 2000, Jaber, working through a phony pharmaceutical wholesale business, illegally diverted pseudoephedrine for use in methamphetamine trafficking organizations. Momoh was his employee, essentially a functionary. Jaber had been introduced to the business by Khalid Abu–Lawi ("Abu–Lawi"), who was not a defendant in this case.

But the indictment and the pleas only told part of the story. I requested Abu–Lawi's presentence report to learn more about the scope of the charges than what was framed by the Momoh–Jaber indictment.[22] The presentence report revealed that Jaber's operation was a very small part of a much larger conspiracy, and that Abu–Lawi was more than simply a facilitator of an illegal Massachusetts operation.

Abu–Lawi was indicted with 26 co-defendants in the Southern District of Florida. The indictment charged a conspiracy beginning over nine months before Jaber's introduction, namely, beginning in April of 1999. The conspiracy was national in scope, including transactions in Florida, California, Oregon, Chicago, and Houston. As the Abu–Lawi presentence report described:

> The investigation revealed a structured network of individuals, international in scope, involved in providing pseudoephedrine to various methamphetamine organizations in the United States. Individuals would acquire pseudoephedrine through the use of 'front'

business. Bulk quantities of the drug were then shipped to California for further distribution to those involved in the manufacture of methamphetamine.

The acquisition of quantities necessary to make even small amounts of methamphetamine is difficult due to limitation on the retail sale of pseudoephedrine [which is an ingredient in common over the counter cold medications.] Therefore, organizations that have formed to procure and illegally divert pseudoephedrine are critically important to the criminal organizations that actually distribute methamphetamine.

The leader of the organization was Habes Habbas ("Habbas"), now a fugitive. He supplied pseudoephedrine to Tarek Zaki Abu–Lawi ("Zaki"), also a fugitive. Since Zaki is Abu–Lawi's uncle, Abu–Lawi was plainly an insider. He played a significant role in the business, obtaining bulk quantities of the drug through a number of front groups, and then diverting it to methamphetamine manufacturers on the West Coast. In effect, he franchised his operation to others, whose "fronts" would purchase the drug for him. He provided them with money, tips on obtaining a Drug Enforcement Administration ("DEA") registration, money laundering, shipping sources, purchasers, pill size, etc.

In effect, Jaber was one such franchisee. Abu–Lawi encouraged Jaber to set up his own pseudoephedrine business, told him how to do it, and gave him cash to get started. He even tutored Jaber about the use of pseudoephedrine and its manufacture. From October 1, 1999, Jaber did what Abu–Lawi suggested. He set up a phony company, obtained a DEA license, opened accounts, and started to purchase pseudoephedrine from legitimate distributors. In November 1999, Abu–Lawi sent

**22.** The presentence report was obtained and distributed to the parties. Neither party contested the facts in the report on which the Court relied.

Jaber money, as well as the telephone numbers of additional distributors from whom to purchase the drug. When Abu–Lawi had a buyer, he provided Jaber with the address, taking the lion's share of the profits. To use just one example, from the first sale, Abu–Lawi received $80,000; Jaber received $20,000.

Jaber met Momoh when Momoh was purchasing furniture at Jaber's father's business. A naturalized citizen, Momoh was a married man with three (soon to be four, at the time of sentencing) small children and an ill wife.[23] While he had an advanced degree from the University of Massachusetts, he was unable to get a job commensurate with his skills. He began working for Jaber in January 2000 for $350 per week; his salary was later raised to $500.

In June 2000, Abu–Lawi and Jaber had a falling out. For a very short time thereafter, until some time in July 2000, Jaber and Momoh worked directly with a customer in California.

But the Jaber operation began to fall apart as well. On July 29, 2000, agents seeking a different suspect searched Jaber's residence in Florida. The fruits of that search, receipts for purchases of pseudoephedrine, led the DEA agents to Jaber's business address in Massachusetts. By August 3, 2000, Jaber told Momoh to dispose of their inventory and then to pretend that there had been a break-in. (Jaber reports that the reason for destroying the drugs was because their inability to find a buyer.) Momoh complied. The business was over.

On July 30, 2002, Jaber was arrested. In a sealed document, counsel outlined his considerable efforts to cooperate with the government—four proffers, meetings in Florida. These efforts were not considered substantial enough in Massachusetts, and were ignored in Florida.

Momoh was arrested on August 1, 2002. He immediately tried to cooperate too, but unlike Jaber, he had no basis—no contacts.

Abu–Lawi had been arrested earlier, on July 31, 2000. He pled guilty and cooperated with the government, offering up all of the individuals, including Jaber and Momoh, whom he set up in the business in the first place. Notwithstanding the scope of his participation in these charges, his Guidelines sentence, initially set at 135 months, was first reduced to 78 months and, finally, to 51 months. The government sought a sentence of 87 months for Jaber, and 70 months for Momoh.

I now turn to an analysis of the Guidelines, their application to this case, and the relationship between the Guideline categories and the statutory purposes of federal sentencing. The sentences I imposed *are* Guideline sentences, reflecting how many originally conceived of the Guideline regime.

### A. *Jaber*

#### 1. *Guideline Analysis*

■ The government and the defendant agreed that a base offense level of 30 reflected the amount of pseudoephedrine in Jaber's possession. In addition, the money laundering charge yielded a base offense level of 29. The parties also agreed that the defendant was entitled to a three-level adjustment for "acceptance of responsibility" under U.S.S.G. § 3E1.1(a) and (b).

The parties differed on: a) whether the grouping provisions (which would reduce the sentence) of the Guidelines applied; b) the extent of the enhancement Jaber was subject to under U.S.S.G. § 3B1.1(c) for

**23.** *See infra* n.28.

his "role in the offense"—two points, as the defendant suggested, or four points as the government urged; and, c) whether Jaber was subject to the two-point enhancement proposed by probation pursuant to U.S.S.G. § 3C1.1 (obstruction of justice) for concealing material evidence and lying to the DEA.

I agreed with probation that Jaber's offenses—money laundering and drugs—should be grouped together. And the parties eventually agreed that an enhancement for obstruction of justice was beyond the scope of the plea.[24]

Both the issue of "role" and "drug quantity" should have raised serious Guideline questions, even pre-*Booker*, given the relationship between the instant charges and the Abu–Lawi prosecution. In one sense, considering the breadth of Abu–Lawi's case is nothing more than a variation on the theme of "real offense" sentencing—looking beyond the four corners of the charge to what the conduct truly comprised.[25] If the government had indicted these defendants in an East Coast conspiracy, Jaber's participation would have been minor relative to the others.[26]

Section 3B1.1 of the Guidelines provides for an increase in the offense level when the defendant was: (a)"an organizer or leader of a criminal activity that involved five or more participants or that was otherwise extensive" (an increase of four levels), b) "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive" (an increase of three levels), or c) "an organizer, leader, manager, or supervisor in any criminal activity other than that described in (a) or (b)" (an increase of two levels). *See* U.S.S.G. § 3B1.1(a-c). Unlike other sections, the role adjustment provision does connect this enhancement to concerns about culpability, public safety, and recidivism:

> This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of defendant's responsibility.

U.S.S.G. § 3B1.1, cmt. (backg'd). While the significance of the enhancement varies, depending on the seriousness of the offense, there is no commentary suggesting how the Commission arrived at those fixed enhancement scores (2, 3, or 4 levels) or why it chose that approach rather than some other.[27]

---

24. Indeed, in my judgment, "obstruction of justice" enhancements raise concerns under both *Booker* and *Blakely* where the government has a choice of charging a separate offense—which would have been subject to a jury trial and the full panoply of procedural safeguards—but instead seeks to enhance a sentence for another offense.

25. As Justice Breyer noted, the Guideline system "that diminishes sentencing disparity—depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction." 125 S.Ct. at 759.

26. The government claims that joining Jaber and Abu–Lawi in a single conspiracy would have been wrong. But whether or not the cases can be formally joined is irrelevant. A "real offense" approach entitles me to consider both.

27. The category "otherwise extensive" is even more ambiguous. *See United States v. Footman*, 66 F.Supp.2d 83, 93 (D.Mass.1999) (affirmed).

Section 3B1.1 does direct the court to look at the "real offense" and consider a number of factors, including (but obviously not limited to): "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4.

Jaber had no criminal record before his encounter with Abu–Lawi. He had had no contacts with, or even information about, pseudoephedrine and its uses. He did essentially what Abu–Lawi directed him to do during most of his involvement with the organization. When he was on his own, he fell on his face. The operation ended in August of 2000.

Between that date and the date of his arrest, he never tried to restart the business. While he may have garnered profits from the operation, his portion pales in comparison to Abu–Lawi's.

Measuring the relative culpability of the participants against the scope of the Abu–Lawi operation suggests that Jaber should receive no enhancement. Moreover, this conclusion is buttressed by the other concerns, reflected in the Guidelines—danger to the public and recidivism.

With respect to the amount of drugs in Jaber's possession—what largely drove the Guidelines sentence—I concluded that the amount did not accurately reflect his culpability. Sometimes quantity is an entirely appropriate proxy for culpability. At other times, it is not. All other things being equal, one who distributes a greater amount of illegal drugs is more culpable than one who distributes a lesser amount. But, as Judge Lynch noted in *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y.2004), a case dealing with fraud amounts, "[i]n many cases ... the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." Drug quantity may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as it reflects the defendant's culpability.

Jaber did not set out to distribute a particular quantity of pseudoephedrine. At first, from January to July, he purchased only the quantities that Abu–Lawi required; nothing more, and nothing less. Then, when he started out on his own, he purchased ten cases of pseudoephedrine, or 62 kilograms, in a single transaction, which he paid for in three installments, but then could not sell. While the quantity may be an appropriate indicator of culpability for Abu–Lawi, it is not for Jaber. It does not, in short, reflect the true "nature and circumstances" of Jaber's offense.

With respect to Jaber's cooperation and acceptance of responsibility, Jaber labored mightily to cooperate with the government. In a sealed affidavit, the defendant revealed his considerable efforts to do so. In Florida, his cooperation did not produce any prosecutions, ostensibly because of a change in personnel in the United States Attorney's office. I cannot give Jaber "credit" for that cooperation simply because I do not have all of the information in the government's possession. Nevertheless, Jaber's repeated efforts to help law enforcement surely bear on his extraordinary acceptance of responsibility, which is both a Guidelines factor and something that impacts on the likelihood of recidivism.

The aforementioned factors suggest that a departure is warranted. However, they

do not suggest the appropriate amount of departure, to which I now turn.

### 2. *18 U.S.C. § 3553(a)*

Jaber's counsel requested a sentence of "time served." I rejected that suggestion. Congress and the Commission have expressed their deep concern that pseudoephedrine offenses be treated seriously. I am not free to reject that approach based on my personal predilection (what I have earlier called the "free at last" regime). Whatever his role vis-a-vis Abu–Lawi, Jaber knew what he was doing; he knew that he had embarked on an illegal career that promised substantial rewards.

Jaber's Guideline sentence, computed as I have set out, would have been a base offense level of 27 with a criminal history of I, or 70–87 months. But to arrive at a sentence under *Booker,* I must go beyond the Guideline framework, directly to the purposes of sentencing under 18 U.S.C. § 3553(a). Ironically, in this case, the Guidelines concerns about "unwarranted disparity among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), call for an out-of-Guidelines adjustment. Ordinarily, the Guidelines do not permit me to make adjustments as between co-defendants in a single case, much less between defendants in separate indictments. *See United States v. Kneeland,* 148 F.3d 6, 16 (1st Cir.1998). However, in the instant case, there is something troubling about the extent to which differences in sentencing were driven not by differences in the crime, but by the happenstance of the way the government indicted, the jurisdictions of indictment, and who ran to cooperate first. Because of Abu–Lawi's prominence, and the timing of his cooperation, the government had virtually all it needed before it got to Jaber. Some adjustment is essential to reduce unwarranted disparity in the case at bar.

With respect to public safety and recidivism, 18 U.S.C. § 3553(A)(2)(c), I conclude that it is exceedingly unlikely that Jaber (or Momoh, as I describe below) will reoffend. They were marginal players at the outset. This experience surely capped their illegal career.

Following the Guidelines template, I departed downward four levels for Jaber, sentencing him to 51 months, roughly equivalent to the sentence of Abu–Lawi.

## B. *Momoh*

### 1. *Guidelines Analysis*

■ With respect to Philip Momoh, all the parties agree that at the outset of his employment with Jaber, he had absolutely no idea that he was involved in an illegal operation. Plainly, that changed at some point during the eight months of the Jaber operation. The government maintains that the sentence it seeks already reflects these circumstances because it dismissed two counts dating from the period when Momoh did not know what he had gotten into. The government suggests that I need do no more. I disagree.

Momoh is entitled to three points for acceptance of responsibility and, perhaps even more, for extraordinary efforts.[28] He did everything he could to help the government, but like the defendant in *United States v. Jurado–Lopez,* 338 F.Supp.2d 246 (D.Mass.2004), he did not have much to offer.

---

**28.** Significantly, probation characterized Momoh's cooperation as extraordinary. Indeed, it recommended that he receive an acceptance of responsibility departure even while also recommending an enhancement for obstruction of justice (a recommendation probation offered pre-*Booker* ).

His base offense level was 30, minus two for his minor role, and minus three for acceptance of responsibility.[29] Grouping the offenses as probation had done leads to 25 as the final offense level. His Guideline range is 57 to 71 months.

Under the Guidelines strictly construed, Momoh would not be eligible for any further reductions. The safety valve, *see* 18 U.S.C. § 3553(f)(1)(5), which allows for further reductions, is reserved for individuals subject to a mandatory minimum sentence.[30] There is no mandatory minimum for pseudoephedrine; the Guideline drafters simply excluded that substance from the provision describing the safety valve. Had the 57–71 months of the Guidelines range been a 60 month mandatory minimum, he would have qualified for safety valve relief.

But, at the very least, Momoh's situation reflects the concerns that animated the enactment of the "safety valve," which enabled certain low-level drug offenders to escape out from under mandatory minimum drug sentences, provided the offenders met fairly rigorous criteria. Prior to the safety valve's passage, a high level offender would offer to cooperate with the government against his subordinates. The subordinates—particularly those at the bottom—were unable to cooperate meaningfully because they knew nothing. It was not at all unlikely that the subordinates would be sentenced to terms longer than that of the "kingpin."

That is precisely the situation in the case at bar. Abu–Lawi got 51 months; Momoh was facing 57–71 months.

## 2. *18 U.S.C. § 3553(a)*

While the government believes that the Guidelines are entirely adequate to reflect Momoh's culpability and the appropriate sentence, I do not agree. The two-level minor role adjustment does not begin to reflect his position in this enterprise—an employee, on a salary, taking directions from Jaber. Moreover, if the drug quantity did not adequately reflect Jaber's culpability, it surely does not reflect Momoh's.

Momoh was a functionary. Although his responsibilities were growing, he still did not take a profit; he was on salary. He had even less control over the direction of the enterprise than Jaber. He took orders from Jaber. The amount of pseudoephedrine that passed through his hands reflects someone else's decisions, not his own. Even in a Guidelines regime, I would have concluded that Momoh's sentence falls outside of the heartland of like offenders. *See United States v. Costello*, 16 F.Supp.2d 36 (D.Mass.1998).

Moreover, between 2000 and the date of Momoh's arrest in 2002, there is no evidence that he engaged in any criminal acts. Indeed, just the opposite: He worked as a mental health worker in Lowell. He counseled individuals on a crisis hotline and gave referrals to hospitals. His hours were from 11:00 p.m. to 7:00

---

**29.** Jaber's and Momoh's offense levels are the same because the pseudoephedrine Guidelines are at such a high level that it does not take much to trigger a higher category.

**30.** U.S.S.G. § 5C1.2, entitled "Limitation on Applicability of Statutory Minimum Sentences in Certain Cases," instructs the court to impose "a sentence in accordance with the applicable guidelines *without regard to any statutory minimum sentence,* if the court finds that the defendant meets the criteria in 18

U.S.C. § 3553(f)(1)-(5) ...." U.S.S.G. § 5C1.2(a) (emphasis added). The cross-listed safety valve provision, entitled "Limitation on applicability of statutory minimums in certain cases," also directs that "the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission ... *without regard to any statutory minimum sentence* ...." 18 U.S.C. § 3553(f) (emphasis added).

a.m. In addition, Momoh worked at the University of Massachusetts Memorial Health Alliance Hospital in the same capacity.

On pretrial release until sentencing, his record was perfect. This was especially significant given the stressors in his life—a wife who was hospitalized and dysfunctional, with Momoh effectively taking over the care of four young children.[31] His residence was foreclosed; he was unable to find a meaningful job. Measuring a departure for "extraordinary family obligations" now in the light of *Booker* and the purposes of sentencing (particularly the likelihood of recidivism), I would find that Momoh qualified for a downward departure on these grounds as well.

None of the purposes of sentencing outlined in 18 U.S.C. § 3553(a) were served by Momoh's incarceration. Accordingly, I sentenced Momoh to two years of probation, six months of which were to be spent in home detention.

## III. *CONCLUSION*

The sentences of Philip Momoh and Issa Jaber are essentially Guideline sentences informed by the teachings of *Booker*. Each Guideline provision was interpreted with a view to the statutory purposes of sentencing, and their application to the cases at bar. In addition, each composite sentence was evaluated against the same statutory purposes. Such a common law process lies at the heart of judging.

**SO ORDERED.**

---

31. Momoh's wife has diabetes, high blood pressure and panic attacks. She refused to drive a car and has been suffering from depression. In June of 2003, she was hospitalized for pancreatitis, and underwent surgery to remove her gallbladder. Momoh has essentially assumed responsibility for the care of the children.