### UNITED STATES of America,

v.

### Arthur L. PIMENTAL and Loretta R. Pimental, Defendants.

### Crim. No. 99–10310–NG.

United States District Court, D. Massachusetts.

April 21, 2005 [1].

---

1. This is an amended version of the Sentencing Memorandum issued in this case on April 15, 2005. This Memorandum replaces the prior version.

Mark J. Balthazard, United States Attorney's Office, Boston, MA, for Plaintiff.

James Rehnquist, Goodwin Procter, LLP, Boston, MA, for Defendants.

### AMENDED SENTENCING MEMORANDUM

GERTNER, District Judge.

Arthur and Loretta Pimental owned and maintained a small, "mom and pop" construction business. They were accused of conspiring to misrepresent the nature of their construction work and the size of their payroll in order to obtain lower premiums for Workers' Compensation insurance from 1993 through 1998.[2] The

2. This case arises from one of several prosecutions brought in Massachusetts by the United States Attorney's Office at the behest of the Insurance Fraud Board of Massachusetts ("IFB"), a state-chartered but privately maintained organization created to investigate and police insurance fraud. The IFB investigation that culminated in these charges was substantially assisted by the local Ironwork-

charges were mail fraud and conspiracy, even though remedies—including civil remedies—for such conduct are available in the state courts. As of the time of the sentencing, no civil remedies had been pursued by the "victim" insurers.

Loretta and Arthur Pimental were charged with eleven counts of mail fraud (Counts 2–15) and a single count of conspiracy (Count 1).[3] After a jury trial in October 2002, Loretta was acquitted of all counts, while Arthur was convicted of Counts 2 and 4 and acquitted of all others. Counts 2 and 4 centered on mailings from two independent loss control inspectors to the Pimentals' insurers.[4] The loss control inspectors were charged with identifying potentially hazardous conditions on the Pimentals' work sites and making recommendations to remedy them.

To determine Arthur Pimental's sentence, the Court must look not only to the explicit text of the Sentencing Guidelines, but also must carefully evaluate their meaning and the resulting sentence in the light of the purposes of sentencing under 18 U.S.C. § 3553(a). *See United States v. Booker*, 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). That analysis, however, is more complex than may appear at first glance. It necessarily raises other questions, such as the standard of proof for evaluating facts post-*Booker*, and to what degree those findings should drive the sentence.

And in this case, there is another, potentially more significant wrinkle: The conduct that the government would have the Court consider at sentencing is the very same conduct that the jury considered and of which they acquitted the defendant. At issue, then, is the continued vitality of the Supreme Court's decision in *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), which upheld an increased sentence for the defendant based on acquitted conduct, in light of its recent decision in *Booker*.

The amount of the loss under the Sentencing Guidelines is at the very least an important starting point of analysis, if not a more definitive factor. *Compare United States v. Wilson*, 350 F.Supp.2d 910 (D.Utah 2005) (hereinafter *"Wilson I"*), *and United States v. Wilson*, 355 F.Supp.2d 1269 (D.Utah 2005) (hereinafter *"Wilson II"*), *with United States v. Crosby*, 397 F.3d 103 (2d Cir.2005). The government argued that the Court should calculate loss based upon the entire scheme alleged in the indictment, including acquitted conduct. The jury, it argued, necessarily had to make certain fact findings to conclude that Pimental was guilty even of the two counts of conviction—it had to find the existence of the scheme to defraud *charged in the indictment* (as well as the fact that the mailings were reasonably foreseeable and in furtherance of the scheme). Furthermore, the government claimed that there is no legal impediment

---

ers' Union, which arranged and housed meetings between IFB investigators and former employees of Pimental. Indeed, there is some suggestion in the evidence that the union facilitated the investigation in retaliation for the fact that Pimental ran a non-union shop.

3. The government voluntarily dismissed Counts 12, 13, and 15 prior to trial.

4. Arthur Pimental moved under Fed. R.Crim. Pro. 29 for entry of acquittal on both counts,

notwithstanding the verdict. I granted the motion. Although I concluded that there was sufficient evidence of a fraudulent scheme, and that the use of the mail in connection with that scheme was foreseeable, I concluded that the government had not demonstrated that the mailings were in furtherance of the scheme alleged. The Court of Appeals reversed, *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir.2004).

to this Court's consideration of evidence underlying acquitted counts. *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), in short, was still good law. Based on the difference between the insurance premiums the Pimentals' company paid and the premiums it owed, the loss figure for sentencing purposes was $502,332.07.[5]

As such, the base offense level under the Guidelines was six, *see* U.S.S.G. § 2F1.1(a), and the amount of loss added ten levels, *see* U.S.S.G. § 2F1.1(b)(1)(K). The factor of "more than minimal planning" resulted in an increase of two more levels, *see* U.S.S.G. § 2F1.1(b)(2). With a criminal history level of one, the proposed Guidelines sentence would be between twenty-seven and thirty-three months. This, the government maintained, was also the appropriate sentence under 18 U.S.C. § 3553(a) because the offense involved conduct over an extended time. Moreover, the crime harmed the insurance companies, the Pimentals' employees, and the public in a variety of ways.

Defendant countered that the government may not rely on acquitted conduct, and that the authority of *Watts* has been eroded by *Booker*. At a minimum, because the jury's verdict covers the period from 1994 to 1995, the loss calculation must be restricted to that time and not the more extended period alleged in the indictment. And even if all conduct were considered, there is no reliable way of determining "loss" under the Guidelines because the Pimentals' work involved various types of steel work, each qualifying for a different rate, with the result that Pimental

might well have paid higher premiums than were required of him.

In addition, Pimental argued that the $502,332.07 loss figure overstates the seriousness of his conduct under Application Note 10 to U.S.S.G. § 2F1.1.[6] And finally, the Guidelines range resulting from the government's loss calculation, 27–33 months, is inconsistent with 18 U.S.C. § 3553(a), for a number of reasons: No one was actually harmed—not the insurers, employees, or the public. Pimental has no criminal history, a close family, and substantial work record. He asserted that only a sentence of probation would be "sufficient, but not greater than necessary, to comply with the purposes" of sentencing under § 3553(a).

As described below, I agreed with the defendant. I sentenced Mr. Pimental to a term of probation for two years, with a fine of $10,000.00, plus interest. I came to that conclusion in a number of alternative ways:

1) I did not believe that it was appropriate to consider acquitted conduct in determining Pimental's sentence. *Booker* cast substantial doubt on the continued vitality of *Watts*. Nor did I agree that the counts of conviction necessarily required the jury to consider the entire scheme alleged in the indictment.

2) Even if I were to consider all of the conduct alleged in the indictment and reargued at sentencing, I would evaluate the evidence by the "beyond a reasonable doubt" standard and find, as the jury found, that there was insufficient evidence to convict on the counts on which the jury acquitted.

---

**5.** I note that this is "for sentencing purposes" because there is no evidence that the insurers actually lost money. *See infra*.

**6.** The applicable Guidelines Manual was the one in effect at the time of the commission of

the instant offense on November 1, 1994. Application Note 10 to U.S.S.G. § 2F1.1 provided: "In a few instances, the loss determined ... may overstate the seriousness of the offense." U.S.S.G. § 2F1.1, cmt. n.10 (1994).

3) Even if I were to consider all of the facts by the burden of proof I outlined in *United States v. Mueffelman*, 327 F.Supp.2d 79 (D.Mass.2004), clear and convincing evidence, or the traditional sentencing standard, a preponderance of the evidence, I did not agree that loss could be reliably determined given the nature of the Pimentals' business and the complexities of computing the premiums owed.

4) Even if the loss were as the government described, I would conclude that that figure dramatically overstated Pimental's culpability, whether considered under the Guidelines or in the light of the 18 U.S.C. § 3553(a) factors.

As such, my Guidelines calculation was as follows: the base offense was six, plus two for "more than minimal planning," yielding an offense level of eight. With a criminal history of one, the Guidelines range was zero to six months. That computation authorized a sentence of probation, which was an entirely appropriate outcome under 18 U.S.C. § 3553(a).

## I. *FACTS*

### A. *The Nature and Circumstances of the Offense*

Arthur Pimental was an iron worker for 28 years. In the 1980s he and his wife Loretta started their own company, Pimental Steel Erectors ("Pimental Steel"), operating out of their home.[7] He obtained Workers' Compensation insurance, describing the company as involved in the preparation of steel reinforced concrete (known as "rebar"), because that was his principal business at the time.[8] By the early 1990s, the economy had deteriorated; his business went under and he worked a number of jobs, including a stint as a baggage handler at Logan Airport. When the economy picked up, he resumed his business.

During the period of time covered in the indictment, April 1993 to April 1999, the company employed a few non-union ironworkers on a seasonal basis and erected steel structures, mostly one or two-story buildings. The erection process entailed the placement of girders, columns, and joints to support the structure, then laying corrugated metal "decking"—the ceiling and floors of the building—and welding it into place. During the charged period, Pimental's company did not do "rebar work."

To obtain Workers' Compensation insurance, as state law requires, *see* Mass. Gen. Laws c. 152, § 25A, Pimental had to provide his insurance companies—Hartford Fire Insurance Companies, Wausau Insurance, and Savers Property & Casualty Insurance Company—with information relating to the type of work performed by his employees and the size of his payroll in the relevant period. Specifically, he was required to enter a four-digit "job classification code" onto forms that he would submit to his insurers.[9] The total amount of the premium is calculated by applying those rates to the company's payroll. The alleged fraud involved the mischaracterization of Pimental Steel's work and the under-reporting of its payroll.

7. The company was variously named Pimental Steel Erectors, A. Pimental Steel Erectors, Inc., and A.P.S. Products, Inc.

8. These facts derive from Pimental's testimony at sentencing. Insofar as they address facts *prior* to the date alleged in the indictment, they are uncontested and offered only for background.

9. The state Workers' Compensation Rating and Inspection Bureau delineates job classifications and designates insurance rates for each classification based on the risk of injury associated with that trade.

Steel erection work carries a significantly higher risk of injury than does concrete foundation work. The insurance rate for steel erection in 1993 was $99.35 per hundred dollars in payroll for buildings over two stories in height, and $69.22 for smaller structures. Foundation work involving steel-reinforced concrete, classified as "concrete construction" or "rebar," was less dangerous. Accordingly, the rate of $41.22 for rebar work was significantly lower than the rate for steel erection work. And some of the work that Pimental Steel performed had the lowest premium rates of all. The rate for decking was $24.66 or $19.82 depending on the type of metal used; the rate for welding was $23.56. While these rates fluctuated from year to year, the rates for welding and decking were consistently less than half the rate of concrete foundation work, which was in turn consistently less than half the rate for steel erection.

Where, as in Pimental's case, employees perform a range of tasks that fall under different classifications, an employer may list more than one classification code and parse out the tasks accordingly. In fact, in May 1999, six months before the government issued its indictment, the state Workers' Compensation Rating and Inspection Bureau issued a report describing Pimental's entitlement to do just that.[10] Though it is clear that Pimental's classification of his company's work as "concrete construction" was inaccurate, the fact that he did *some* steel erection work did not mean he was obligated to insure his *entire* operation under this category. Had he allocated the work and maintained the appropriate documentation for each classification, including his decking work, his rates would have been lower.

## B. *Indictment and Trial*

On September 29, 1999, a federal grand jury indicted the Pimentals on one count of conspiracy, in violation of 18 U.S.C. § 371 (Count 1), and fourteen counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2–15). The indictment alleged that the Pimentals falsely characterized their work entirely as "concrete construction" so that they could take advantage of a lower insurance rate and pay lower premiums. In addition, the Pimentals were charged with under-representing their payroll as part of the same scheme. The misrepresentations were alleged to have been made in conversations between Loretta Pimental and auditors, and in applications for insurance signed by Arthur Pimental. Arthur Pimental was also alleged to have lied to the loss control inspectors who visited him concerning the size of his payroll and whether there were any job sites ongoing that they could inspect.

### 1. *Acquitted Counts Involving Loretta Pimental*

Loretta Pimental was acquitted of all counts. The testimony at trial was significant. It established that it was Loretta Pimental, rather than the defendant, who dealt directly with the various insurance company auditors. Loretta worked out of her home, where the books were kept, and where she met with the auditors. The process seemed rather informal. The government attempted to persuade the jury that Loretta Pimental had provided false information to these auditors at her husband's behest, as part of a scheme to

---

**10.** The Bureau concluded that welding of steel decking inside buildings, miscellaneous welding, installation of sheet metal to building exteriors, installation of concrete foundations, and erection of steel frames all fell under different classification codes, with different insurance rates. The Bureau stated that, under the state Workers' Compensation regime, Pimental was in fact entitled to allocate payroll among the various job classifications as appropriate.

defraud the insurers. The jury was not persuaded.

### 2. *Acquitted Counts Involving Arthur Pimental*

Arthur was also acquitted of all counts of conspiracy and all but two of the substantive counts. The jury rejected the claim that Pimental conspired with his wife to reduce their insurance premiums. And they rejected each and every substantive count that dealt directly with the means by which that conspiracy would have been achieved, namely through misrepresentations to insurers in applications about payroll size and the nature of the Pimentals' business.

### 3. *Counts of Conviction*

The only crime that the jury found to have been proved beyond a reasonable doubt concerned Arthur Pimental's meetings with loss control inspectors on two occasions in 1994 and 1995. Significantly, the reports of the loss control inspectors did not directly impact the determination of premiums. They were charged with identifying potentially hazardous conditions on Pimental's work sites and making recommendations to improve safety. Reports of this nature are routinely prepared by loss control inspectors for the purpose of minimizing the risk of accidents in the workplace or at least satisfying insurers that efforts have been taken toward that end.

Count 2 involved the mailing of an "Account Data Report," prepared and dated October 5, 1994, detailing the findings of Bill Brooks, an independently contracted loss control inspector to Hartford, Pimental's insurer at the time. The October 5 Report memorialized Brooks' meeting with Pimental the day before, in which Pimental told Brooks that his business was to install steel-reinforced concrete and that he had no jobs in progress. Brooks was therefore unable to visit any work sites. Neither representation was true.

Count 4 involved an October 5, 1995, letter from Timothy J. Bergeron, a second loss control inspector, to Pimental himself. The mailing memorialized Bergeron's visit with Pimental on terms and under circumstances similar to Brooks, all of which were again untrue.

## II. *LAW*

The United States Sentencing Guidelines have always put a premium on quantitative measures like the amount of loss, or the quantity of drugs. *See* U.S.S.G. § 2F1.1. That makes sense, Guidelines or no Guidelines. Someone who steals more may be more culpable than someone who steals less. The size of the offense is an important starting point in sentencing whether under the Guidelines or more generally under 18 U.S.C. § 3553(a) (stating that sentences should provide "just punishment" and reflect "the seriousness of the offense").

The question raised by the recent Supreme Court decisions culminating in *Booker* is who should decide facts like loss that are of considerable significance to sentencing, by what standard of proof they should be decided, and to what degree those findings should determine the sentence. And the instant case raises the further issue of whether facts underlying the counts for which the defendant was acquitted should be considered at all.

I will first address issues related to fact finding. Then I will address the amount of loss, whether it can be ascertained with any certainty in this case, and whether it adequately reflects Arthur Pimental's culpability under 18 U.S.C. § 3553(a).

### A. *Acquitted Conduct*

 The government argued that I must consider the acquitted conduct, not only of Arthur Pimental but also of Loretta Pimental, for two reasons: First, *Watts*

is still good law. Second, the offense of conviction necessarily required a finding that the mailings were part and parcel of the scheme alleged in the indictment.

### 1. *United States v. Watts*

*United States v. Booker* substantially undermines the continued vitality of *United States v. Watts* [11] both by its logic and by its words. It makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 2538, 159 L.Ed.2d 403 (2004), and *also* conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing.

The jury is intended to be the centerpiece of the criminal justice system. Determining "more than actual truth, guilt, or innocence, its decisions represent a popular conception of a 'just verdict.'" Judge Nancy Gertner, *Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing*, 32 Suffolk U.L.Rev. 419, 433 (1999) (hereinafter *Circumventing Justice*). In effect, juries rule on "legal guilt, guilt determined by the highest standard of proof we know, beyond a reasonable doubt. And when a jury acquit[s] a defendant based on that standard, one would have expected no ad-

ditional criminal punishment would follow." *Id.* See also *United States v. Concepcion*, 983 F.2d 369, 396 (2d Cir.1992) (Newman, J., concurring) ("A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal.") It is, to quote the Court in *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), "a matter of simple justice." [12]

Justice Stevens said as much in the principal opinion in *Booker*. While he concluded that *Watts* "is not inconsistent with today's decision," he acknowledged that the case did not involve "any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment." *Booker*, 125 S.Ct. at 754. He characterized *Watts* as reflecting "a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause" and noted further that it "did not even have the benefit of full briefing or oral argument." 125 S.Ct. at 754 n. 4. Thus, he concluded that it was "unsurprising that [the Court] failed to consider fully the issues presented to us in these cases." *Id.*

To be sure, one may argue that *Watts* was not undermined by *Booker* by emphasizing the remedy opinion rather than the merits opinion. [13] While the merits opinion

---

**11.** Watts was convicted of possessing cocaine with intent to distribute under 21 U.S.C. § 841(a)(1) and acquitted of using a firearm in the course of a drug offense under 18 U.S.C. § 924(c). 519 U.S. 148, 149–50, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). Despite his acquittal on the firearms charge, the district court increased the sentence because of the firearm possession. *Id.* at 150, 117 S.Ct. 633. The Guidelines required an upward increase in the sentencing range "if a dangerous weapon (including a firearm) was possessed" during the offense of conviction. *See* U.S.S.G. § 2D1.1(b)(1) (1995).

**12.** "As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label 'sentence enhancement' to describe the latter surely does not provide a principled basis for treating them differently." *Id.*

**13.** In *Booker*, the Supreme Court issued two separate majority opinions. First, Justice Stevens wrote for the Court and held that the rule announced in *Blakely* applied to the Guidelines. 125 S.Ct. at 746. He based his

focuses on the Sixth Amendment and the requirement that juries determine facts essential to sentencing, the remedy opinion concludes that if the Guidelines are advisory and facts are not outcome determinative, there is no constitutional problem with having judges decide facts essential to sentencing.[14] *See United States v. Duncan*, 400 F.3d 1297 (11th Cir.2005) (holding that retroactive application of the remedy opinion solves whatever constitutional problems may be presented by sentencing on the basis of acquitted conduct). Indeed, the remedial majority specifically instructed judges to maintain "a strong connection between the sentence imposed and the offender's real conduct ...." *Booker*, 125 S.Ct. at 757.

In a nutshell, this position, that one can consider acquitted conduct because the Guidelines are now advisory, seems to hark back to the period pre-mandatory Guidelines when there was a clear line between the trial sphere and the sentencing sphere. Juries found facts subject to the rules of evidence and the highest burden of proof that could be imposed. Judges, exercising something like a clinical judgment about the appropriate sentence, were not so constrained. They could consider all facts; they had only to test them by a fair preponderance of the evidence.[15] What the judge did in sentencing—a specialized, professional function—was totally different from what the jury did. There was no Sixth Amendment issue, or even the requirement of full evidentiary safeguards because sentencing facts did not have binding and determinate consequences. Thus, just as during the pre-Guidelines discretionary sentencing regime, when a judge could consider acquit-

opinion on the premise that the Guidelines were mandatory and imposed binding requirements on all sentencing judges. *Id.* at 749. Second, and in light of Justice Stevens' holding, Justice Breyer wrote for the Court and invalidated two provisions of the Sentencing Reform Act of 1984 that had the effect of making the Guidelines mandatory. *Id.* at 756.

**14.** Justice Stevens acknowledged that there would have been no Sixth Amendment constitutional violations in the cases before them if the Guidelines were advisory. "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment .... Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the SRA the provisions that make the Guidelines binding on district judges; it is that circumstance that makes the Court's answer to the second question presented possible. For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."

125 S.Ct. at 750. In his remedy opinion, Justice Breyer added, "[W]ithout this provision—namely the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges—the statute falls outside the scope of *Apprendi's* requirement." *Id.* at 764 (internal quotation omitted).

**15.** As I wrote in an earlier opinion: "The Supreme Court's rationale [in *Booker*] was clear: pre-guidelines, judges and juries each had specialized roles. Juries found facts, while judges exercised discretion—judgment—in imposing sentences. Jury decisionmaking was constrained by the rules of evidence and the highest burden of proof that could be imposed—beyond a reasonable doubt. Sentencing decisions were not so constrained. Judges could consider virtually all facts and circumstances about the offense and the offender. *See* 18 U.S.C. § 3661." *United States v. Jaber*, 362 F.Supp.2d at 368, 2005 WL 605787, at *2 (D.Mass.2005). The problem, I noted, came with mandatory guidelines: "With mandatory rules, the roles began to blur. What the *judge* did mirrored precisely what the *jury* did—finding facts with determinate consequences, only in a setting with few procedural safeguards, and even less legitimacy." *Id.*

ted conduct in the mix of sentencing facts, so he or she can do so now after *Booker*.[16]

But we cannot roll back the clock to the pre-Guidelines regime, not after eighteen years of Guidelines sentencing and the teachings of the case law from *Apprendi* to *Booker*.[17] We are not today where we were in 1987, before the Guidelines were implemented.

First, as described above, pre–1987 the trial sphere was rule-bound and sentencing was comparatively rule-less. Sentencing today—*even post-Booker*—is still profoundly influenced by the rules, namely the Guidelines. That is what the remedy opinion admonishes; that is what the post-*Booker* case law suggests. It is, in effect, a hybrid regime—neither purely discretionary nor mandatory Guidelines. And that fact has certain consequences in terms of the significance of acquitted conduct, and more generally, the procedural protections at sentencing.

To consider acquitted conduct trivializes "legal guilt" or "legal innocence"—which is what a jury decides—in a way that is inconsistent with the tenor of the recent case law. *See* Gertner, *Circumventing Juries*, 32 Suffolk U.L.Rev. at 436. After *Apprendi*, the focus was on whether a given sentence exceeded what the jury verdict (or plea) authorized.[18] If the Guidelines are mandatory, "what the jury verdict authorized" means a sentence framed by the facts tried—*excluding* aggravating enhancements to that offense and surely excluding aggravating relevant conduct if those facts did not form part of the jury's verdict.[19] With advisory Guidelines, when the trial judge is not required to accept a sentence driven by enhancements or relevant conduct, "what the jury verdict authorized" means a sentence just within the statutory maximum.

However, when a court considers acquitted conduct it is expressly considering facts that the jury verdict not only failed to authorize; it considers facts of which the jury expressly disapproved. Nor is it enough to hark back to the idea that the jury "only" decides guilt beyond a reasonable doubt while the judge decides facts by a fair preponderance of the evidence.[20]

---

**16.** As I describe in *Circumventing Juries:* "Surely, judges in the indeterminate regime occasionally considered acquitted conduct, but not with the same effect. Judges had discretion to disregard such conduct. Under the Guidelines judges must resolve all disputed facts material to the sentence. And, while pre-Guideline data may have included acquitted conduct in the mix of sentencing factors, such data did not have quantifiable consequences; in a guideline regime, each fact has a determinate impact." Gertner, *Circumventing Juries*, 32 Suffolk U.L.Rev. at 433 (citations omitted.)

**17.** Though the Sentencing Reform Act was passed in 1984, the United States Sentencing Guidelines did not become effective until November 1, 1987.

**18.** Indeed, that phrase "authorized by the jury verdict" recurs over and over again in this line of cases. *Booker,* 125 S.Ct. at 742, 753, 754 (Stevens, J.); *Ring v. Arizona,* 536 U.S. 584, 604, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**19.** In *Apprendi,* the Court held that the Sixth Amendment requires juries to find beyond a reasonable doubt the existence of "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." 530 U.S. at 490, 120 S.Ct. 2348. In *Blakely,* the Court defined the "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S.Ct. at 2537 (emphasis in original).

**20.** In *Watts,* for example, the Court noted that the lower court had "misunderstood the preclusive effect of an acquittal, when it asserted that a jury 'reject[s]' some facts when it returns a general verdict of not guilty." *Watts,* 519 U.S. at 155, 117 S.Ct. 633 (citations omitted). Specifically, the Court indicated that the lower court did not understand "the significance of the different standards of proof that govern at trial and sentencing." *Id.* An

The argument is circular: The fair preponderance standard made sense in the context of fully indeterminate sentencing. It does not make sense in this hybrid regime where rules still matter, and certain facts have important, if not dispositive, consequences. In any event, concerns about respecting the jury as an institution persist in this post-*Booker* advisory regime, even if comparable concerns had not surfaced in the years prior to the Sentencing Guidelines.

And quite apart from acquitted conduct, all facts are not equal today, especially not facts that amount to separate crimes. Here, the facts that the government sought to have me consider are not facts enhancing the crime of conviction, like the presence of a gun or the vulnerability of the victim. Rather, they are facts comprising different crimes, each in a different count. And the jury acquitted of those counts.[21]

This takes me back to the beginning: To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense—as a matter of law or logic.

### 2. *Standard of Proof*

██ Even if *Watts* emerged unscathed from *Booker*, and a judge may consider all facts, including acquitted conduct, the standard of proof to be applied should be beyond a reasonable doubt. As I noted

above, we are in a hybrid regime, neither fish (totally indeterminate) nor fowl (totally mandatory.) Whether the Guidelines are presumptively reasonable, *see Wilson I* and *Wilson II*, carefully considered, *see United States v. Jaber*, 362 F.Supp.2d 365 (D.Mass.2005), or something in between, *see United States v. Crosby*, 397 F.3d 103 (2d Cir.2005), they continue to play a critical role. Certain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof.

In effect, the impact of the case law on sentencing from *Apprendi* to *Booker* is anomalous. It has added both more flexibility and more formality to the sentencing process. The *Booker* remedy decision made the Guidelines advisory, i.e. more flexible. But the principal decision in that case and those that had foreshadowed it reflected the Court's new concern with the formal procedures for determining facts essential to sentencing.

Indeed, even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is. *See, e.g., United States v. Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("The Fifth Amendment [ ] guarantees that no person shall be deprived of liberty without due process of law .... It is the manifest duty of the courts to vindicate those guarantees.").[22] Certain facts are

acquittal, the Court noted, "does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *Id.* As such, "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 156, 117 S.Ct. 633

**21.** To be sure, the government could have charged only the two loss control inspector counts, convicted Pimental on them, and then

tried to argue the rest of the facts in the sentencing phase. While I am troubled by that approach for the reasons described below, at the very least that situation does not involve the same institutional concerns as here, i.e. the significance of the jury's verdict.

**22.** As I noted in *What Has Harris Wrought?*, 15 Fed. Sent. R. 83, at \*1 (Dec.2002), writing about the implications of *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002): "The Court's approach is 'all or nothing': if there is no jury trial, the

significant, whether or not they play a dispositive role. *See, e.g., United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019, 1027 (D.Neb.2005) (finding that "[i]n order to comply with due process in determining a reasonable sentence, this court will require that a defendant is afforded procedural protections under the Fifth and Sixth Amendments in connection with any facts on which the government seeks to rely to increase a defendant's sentence"); *id.* at 1027 n. 8 ("This approach may not be mandated by *Booker,* but it is not inconsistent with, nor prohibited by, *Booker.*").

We cannot have it both ways: We cannot say that facts found by the judge are only advisory, that as a result, few procedural protections are necessary and also say that the Guidelines are critically important. If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely, proof beyond a reasonable doubt.

### 3. *The Relationship Between the Counts of Conviction and the Scheme Alleged*

■ I did not accept the government's argument that even if I were to look only at the offense of conviction, I would still be obliged to consider all of the evidence. The government assumed that the jury had to have accepted the scheme in its entirety as alleged in the indictment in order to convict on the two counts.

The instructions spelled out the elements of mail fraud:

First, a scheme, *as charged in the indictment,* to defraud or to obtain money or property by means of false or fraudulent pretenses or material omissions;

Second, the defendant's knowing and willful participation in this scheme with the intent to defraud or to obtain money or property by means of false or fraudulent pretenses or material omissions; and

Third, the use of the United States mail on or about the date charged, in furtherance of this scheme.

The government took the phrase "as charged in the indictment" to mean all or nothing—the full scheme from 1993 to 1999 and all of the misrepresentations alleged or nothing at all. That makes no sense.

Typical conspiracy instructions permit the jury to choose any one of the overt acts of a conspiracy; they need not find them all. Moreover, there is no way that the jurors logically could have accepted the "full scheme" for the purpose of evaluating Counts 2 and 4, and acquit of everything else.

Broadly speaking, the counts can be logically divided into two sets: 1) those dealing with Arthur Pimental's face-to-face meetings with the loss inspectors, on the one hand, and 2) those dealing with Loretta Pimental's meetings with the insurance company auditors and Arthur Pimental's signed applications for insurance, on the other. It is consistent for the jury to have accepted guilt with respect to the former, and acquitted with respect to the latter.

Pimental met directly with the loss inspectors. He told them that no men were working on jobs at the time and he characterized his work as rebar. The jury could have found only one of the facts relayed to the loss inspectors to be false, such as the statement of who was working where, or that only certain false statements were

---

'all' of our criminal justice system, there is next to 'nothing,' the comparative informality of sentencing. But, in my view, even if facts that lead to mandatory minimum sentences need not be litigated before juries, they should, at the very least, be litigated in a setting of heightened due process protections."

made with criminal intent. Moreover, they could have found that whatever misrepresentations were made, they were not part of a scheme of the breadth alleged, over the extended period of time alleged.

And convictions on those counts were not inconsistent with acquittals on the others. The loss control officers' role in premium setting was less than clear. Their goal was to assure the companies that the work place was safe. Pimental's statements could have been characterized as fraudulent by the jury even if they were simply part of a scheme to keep the inspectors off-site to avoid safety citations. Or, if his actions in connection with the loss inspectors were part of a scheme to keep his premiums low, the jury could have concluded that it only covered 1994 and 1995.

On the remainder of the counts dealing with the insurance applications and the meetings with auditors the jury might well have been persuaded by defense proof that there was no criminal scheme since the Pimentals paid more in premiums than they should have had they properly characterized their jobs, including welding and decking. Indeed, they could well have concluded that the defendant's acts in this regard look more and more like negligence or inadvertence, the general chaos of a "mom and pop" operation, than a series of deliberate, fraudulent acts.

Applying the standards described above, I found the following: The only evidence I could consider was evidence defining the counts of conviction, the events in the 1994 and 1995 period.[23] Even if I were to look at the entire scheme—including facts underlying acquitted conduct—and test it by the standard of proof beyond a reasonable

doubt, I would agree with the jury's acquittals on those counts.

## B. *Determining Loss*

██ Indeed, even if I were to accept the government's argument *in toto* and consider all facts without regard to the jury's verdict and test them by the usual sentencing burdens of proof, I would still reject the loss figure, over half a million dollars, urged by the government. No actual loss resulted from the misrepresentation of Pimental's work as "concrete construction." No claims were made under the policy. Nor could I meaningfully calculate intended loss. As noted above, it is reasonable to believe that Pimental paid higher premiums than he should have, had he properly characterized his tasks.

While the government claimed that Pimental could not have qualified for lower premiums by allocating his work in all three categories—including decking and welding—because his records were entirely inadequate, the argument proves too much. The paperwork of Pimental Steel *was* chaotic. But the chaos surrounding this bears on both the reliability of the loss figure and the appropriateness of the use of loss to determine culpability. It is difficult to determine how much the insurance companies were owed relative to what he paid, precisely because Pimental may have paid even less if he had behaved more rationally by keeping records and properly allocating the work. His failure to do so hardly makes him more culpable.

And as the jury concluded with respect to the payroll misrepresentations, there was no evidence that was conduct for which Arthur Pimental was responsible.

---

**23.** The First Circuit affirmed my conclusion that there was sufficient evidence to present the case to the jury, using the standard of Rule 29. Fed. R.Crim. Pro. 29. My enterprise at sentencing is different; it is to determine the actual scope of the offense. I had the benefit of hearing the evidence at trial and again at sentencing and living with the case for a number of years.

The loss inspectors involved in the convicted counts did not inquire about payroll. They asked only who was working and what kind of work they did. Payroll issues were not in Arthur Pimental's purview. They were entirely handled by Loretta Pimental. Nor was there evidence that the Pimentals had coordinated her dealings with the auditors. Arthur was, in effect, a shop foreman; Loretta was the bookkeeper.

At the worst, assuming that loss could be reliably determined, I surely would not accept the roughly half a million dollar figure as a measure of Arthur Pimental's culpability in this scheme. Significantly, even the Guidelines recognize that there are times that amount of loss overstates a defendant's culpability.[24]

And apart from the Guidelines, the case law has recognized that while there are times that quantity is an entirely appropriate proxy for culpability, at other times it is not. As Judge Lynch noted in *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y.2004), a case dealing with fraud amounts, "[i]n many cases ... the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."

This is one of those cases. Nothing in the record suggests that Pimental set out to defraud his insurers of over half a million dollars. While he tried to minimize his premiums, he did so carelessly. If he had been more careful, allocating all the tasks across his payroll, he would have paid less.[25]

### C. *Section 3553(a) Factors*

The government argued not merely for the Guidelines range of 27 to 33 months, but for the high end of that range. Whether or not the insurers lost money, according to the government, Pimental's workers were harmed. The loss control inspectors tried to see Pimental's job sites to provide advice about safety. Pimental lied to keep them from doing so. The government claimed that Pimental did not want the inspectors to see that he was not doing concrete foundation work and that in so doing he jeopardized his workers' safety.

The government offered evidence of Occupational Safety and Health Administration ("OSHA") violations to buttress its claim that Pimental's workers were the victims. It pointed to the death of one worker, Mr. Conroy, and argued that was part of a pattern of indifference. He exhibited such a lack of concern, the government argued, that he even avoided the insurance company representatives after Conroy died.

The government's argument is troubling. Defendant claimed, and I have no reason to doubt, that he did not call the insurers immediately after Conroy's death not because he was avoiding anything, but because he was spending much of his time

---

24. U.S.S.G. § 2F1.1, cmt. n. 10 (1994). That section recognizes that in some situations application of the fraud loss table can overstate the seriousness of the offense. As one court described it, "[w]here application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward." *United States v. Stuart*, 22 F.3d 76, 83 (3d Cir.1994).

25. If I were to look at the premiums arguably underpaid in 1994 and 1995, the total would be approximately $26,000.00, which would increase Pimental's Guideline range by four levels, to 10–16 months. *See* ¶ 31, Presentence Report. But while that figure addresses my concerns about taking into account acquitted conduct, it does not address my concerns about the fundamental reliability of the numbers—what premiums owed means in the first instance.

with Conroy's widow to help her in any way he could.

And with respect to the OSHA proceedings, it is entirely ancillary to this sentencing. The claim was settled. There was no coherent evidence in this proceeding as to its scope, the issues it addressed, or even if it covered the same period of time as the time covered by the counts of conviction. Just as a criminal prosecution should not be a collection mechanism for insurers who never pursued civil remedies, neither can it be an OSHA enforcement proceeding for the government.

A sentence of probation is entirely appropriate here under 18 U.S.C. § 3553(a). It will deter like offenders. It is unimaginable that a small businessman knowing what happened to Pimental would risk the ire of the Insurance Fraud Bureau and the federal law enforcement authorities. And it is surely unimaginable that Pimental would repeat this behavior. There was no issue of workers' safety that I was in a position to address in a sentencing proceeding, nor is there any question that this punishment fits the crime of conviction.

**SO ORDERED.**