**UNITED STATES of America, Plaintiff,**

v.

**Jose P. MOLINA, Defendant.**

**No. 94 CR 576.**

United States District Court,
E.D. New York.

April 30, 1997.

Zachary Carter, U.S. Atty., by Paul Weinstein, Brooklyn, NY, for government.

Lawrence Mark Stern, New York City, for defendant.

WEINSTEIN, Senior District Judge.

Resentencing of Jose P. Molina provides further ground for the legal profession's rumination on the dubious state of our criminal sentencing law.

In the spring of 1992, four young men—defendant Jose P. Molina, Carlos Castro, Billy Santiago, and Richard Serrano—met in idle discussion. None, except Castro, had a criminal record. They had not been successful in school, although Molina had some college credits. Molina was working as the sole supporter of his extended family. The others were unemployed. Talk turned to the possibility of holding up one of the armored trucks delivering cash and food stamps to a check cashing store in their Brooklyn neighborhood. Idle palaver grew into a specific plan. Santiago and Serrano would be the gunmen, Castro would supply the weapons, and Molina would drive the getaway car.

Castro, after having provided the guns, on the morning of the planned robbery excused himself from further participation claiming to be busy with errands. The others proceeded as planned, with Santiago and Serrano carry-

ing the weapons and Molina behind the wheel.

Molina double-parked in front of the check-cashing store while his armed confederates alighted to await the arrival of the armored truck. A woman driving a car parked at the curb and blocked by the getaway car ordered Molina to move so she could pull out. Obediently he acquiesced and circled the block in search of another parking space.

The armored truck arrived while Molina and the getaway car were out-of-sight. Santiago approached the guard who was carrying bags of money, instructing him to drop them. As the guard turned to flee Santiago fired his machine gun. The guard returned fire striking Santiago three times. Serrano, fleeing, fired his .38 caliber pistol in the air. During the melee, a seventy-nine year-old bystander was struck in the foot by a ricocheting bullet from the gun of one of the armored car guards.

Molina never got back to the scene of the botched attempt. Upon learning of the gunfire he fled to his house.

Santiago, injured, was arrested at the scene. The primary shooter and arguably the most culpable, he was the first to be sentenced. The government insisted that he plead guilty to counts charging conspiracy to commit robbery, 18 U.S.C. § 1951, attempted robbery, 18 U.S.C. § 1951, and use of a machine gun during a crime of violence, 18 U.S.C. § 924(c)(1). He was sentenced to *408 months* in prison, a term increased by a statutorily mandated thirty-year "enhancement" for crimes committed with a machinegun. *See* 18 U.S.C. § 924(c)(1).

Serrano was charged with four counts—conspiracy to commit robbery, and attempted robbery, use of a machine gun during a crime of violence, and attempted robbery of United States property, 18 U.S.C. § 2112. He initially pled not guilty, but then reversed course and signed a cooperation agreement with the government, pleading guilty to conspiracy to commit robbery and the machine gun charge. The government's motion for a downward departure based on substantial as-sistance was granted. Serrano was sentenced to *60 months* in prison.

Castro and Molina were charged with five counts: conspiracy to commit robbery, attempted robbery, use of a machine gun during a crime of violence, attempted robbery of United States property, and assault, 18 U.S.C. § 2114. They pleaded not guilty and went to trial. Serrano testified against them.

Castro, the gun supplier, was acquitted. Molina was found guilty of one of the robbery charges. The jury failed to reach a verdict on the other counts, including use of a machine gun during a crime of violence.

Jury nullification of sentences deemed too harsh is increasingly reflected in refusals to convict. Jurors are aware of the huge sentences that result from conviction. Attacks on a turncoat's credibility require defense counsel to inform the jury that the witness' deal with the government was designed to avoid the huge penalties faced by himself and those on trial. *See, e.g.,* Trial Transcript of *United States v. Jose P. Molina and Carlos Castro,* at 226 (May 2, 1995)("Q: You were advised by a judge when you pled guilty that you were looking at 50 years to life, correct? SERRANO: Correct"). This phenomenon of self-defeating overly-harsh sentences probably explains the jury's refusal to convict Castro and its lack of agreement as to Molina's guilt of most of the crimes for which he was being tried. The public apparently supports sentences less severe than those mandated by the Guidelines in cases such as this one. *See* U.S. Sentencing Commission, Research Bulletin—Just Punishment: Public Perceptions and the Federal Sentencing Guidelines 7–8 (March 1997).

As required by the Sentencing Guidelines interpreted by the sentencing court, Molina was sentenced to 78 months imprisonment—in the middle of the Guideline range, but still a full 18 months more than the gun-wielding, but cooperating Serrano. The court of appeals remanded with directions that under the Guidelines the sentencing court must apply an additional six levels to Molina. *United States v. Molina,* 106 F.3d 1118, 1124 (2d Cir.1997). Molina is in the lowest criminal history category. He must, therefore, be sentenced to somewhere between 135 to 168

months in prison. There are no appropriate grounds for downward departure. Molina is sentenced to *135 months* in prison.

Molina made two mistakes. The first was entering into a conspiracy to rob an armored truck and acting to carry out the plan. His second mistake was in seeking a trial—his Constitutional right—rather than in quickly working out a plea deal with the government. The result is that Molina, although no more culpable than any of his co-defendants, more apt to be rehabilitated, and more likely to be harmed and preyed upon in prison, will languish under a sentence much longer than that of all but one of his confederates. His two year-old son will spend more than a decade of his childhood without his father. This is what the Guidelines as interpreted by the courts require.

Sentences are now determined primarily by the discretion of the prosecution and, secondly, by the mechanics of the Guidelines. *See, e.g., United States v. Roberts,* 726 F.Supp. 1359, 1364–67 (D.D.C.1989) (Guidelines unconstitutional on due process grounds based upon transfer of unreviewable discretion to prosecutor), *rev'd sub nom., United States v. Doe,* 934 F.2d 353 (D.C.Cir.1991); *see also, e.g.,* Mary Pat Flaherty and Joan Biskupic, Prosecutors Can Stack the Deck: Sentencing Powers Shift From Judges, Wash. Post, Oct. 7, 1996, at A1 (quoting Judge Richard P. Conaboy, Sentencing Commission Chairman, " 'almost everyone but the prosecutors agree that the system as it's presently operated gives enormous power to the prosecutor and almost a control over the sentencing process' "); William J. Powell & Michael T. Cimino, Prosecutorial Discretion Under the Federal Sentencing Guidelines: Is the Fox Guarding the Henhouse? 97 W.Va. L.Rev. 373 (1995). The role of the court acting for the public and fitting the punishment to the individual crime and the criminal is almost negated. "[A]s we have come to learn, the Guidelines are rigid in formulation and, thus, often produce harsh results that are patently unfair because they fail to take account of individual circumstances that might militate in favor of a properly 'tailored' sentence." *United States v. Harrington,* 947 F.2d 956, 964 (D.C.Cir.1991) (Edwards, J.,

concurring); Charles J. Ogletree, Jr., The Death of Discretion? Reflections on the Federal Sentencing Guidelines, 101 HARV. L.REV.1938, 1953–54 (1988) (Guidelines' failure to allow adequate consideration of offender characteristics).

The all-too-familiar harshness required by rigid federal Guidelines, the case law interpreting them and the depredations they wreak upon individual defendants and their families calls to mind the rigid and cruel innkeeper, Procrustes, encountered by Theseus on his journey to Athens. Rather than providing visitors to his inn with appropriate beds, Procrustes is said to have placed every visitor upon an iron couch, stretching those who were too short and lopping-off as much as was necessary from those who were too long in order to make one bed fit all.

Theseus reportedly killed the evil Procrustes. Procrustean Guidelines are not so easily dealt with. There are now only dim portents of a more balanced scheme in the offing. *See Koon v.United States,* —— U.S. ——, —— – ——, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996) (decisions by courts exercising "traditional sentencing discretion" to be reviewed under "abuse of discretion" standard).

Even though Congress specified that a purpose of the Sentencing Commission was to establish policies and practices that "avoid[ ] *unwarranted sentencing disparities among* defendants with similar records who have been found guilty of similar conduct," 28 U.S.C. § 991(b)(1)(B) (emphasis added), the case law rejects equalization or rectification of sentence disparity among co-defendants as a basis for departure *See United States v. Joyner,* 924 F.2d 454, 461 (2d Cir. 1991); *United States v. Alba,* 933 F.2d 1117, 1123 (2d Cir.1991); *United States v. DeRiggi,* 45 F.3d 713, 717 (2d Cir.1995) (district court not permitted to "rectify" sentencing disparities between co-defendants).

Defendant is sentenced to the minimum under the Guideline range—135 months in prison.

The result:

| | |
|---|---|
| Santiago | 408 months in prison |
| Molina | 135 months in prison |
| Serrano | 60 months in prison |
| Castro | 0 months in prison |

Under the blindfold, does justice weep?

So ordered.