**UNITED STATES of America,**

v.

**Jose SANTIAGO, et al., Defendants.**

**No. 00 CR 0237.**

United States District Court, S.D. New York.

Feb. 6, 2006.

Gerald J. Dichiara, Hershel Katz, New York, NY, for Elvis Rodriguez.

Bruce McIntyre, McIntyre & Pope, New York, NY, Michael Fred Bachner, Bachner & Herskovits, P.C., New York, NY, for Adrian Agostini.

Aitan David Goelman, Asst. U.S. Atty., Mary Jo White, U.S. Atty. Crim. Div., New York, NY, for USA.

## DECISION AND ORDER

MARRERO, District Judge.

### I.  BACKGROUND

Defendant Julius Williams ("Williams") was sentenced by this Court to 600 months of incarceration upon his conviction at trial by a jury of participating in a racketeering conspiracy (Count Two) and in a narcotics conspiracy (Count Three) to distribute crack cocaine. The charges against Williams arose out of his involvement with the criminal activities of a drug gang operating at East 137th Street in the South Bronx that the Government dubbed "Thief David's Crew." The leader of the enterprise, Jose Santiago ("Santiago"), and another member, Adrian Agostini ("Agostini"), were tried along with Williams.[1] (Seventeen other co-defendants pled guilty.) The jury also convicted Williams of a charge of participating in a racketeer-

---

1.  Relevant background regarding this case is detailed in various rulings by this Court. *See, e.g., United States v. Santiago,* 214 F.Supp.2d 421 (S.D.N.Y.2002); *United States v. Santiago,* 207 F.Supp.2d 129 (S.D.N.Y.2002); *see also United States v. Santiago,* 126 Fed.Appx. 21 (2d Cir.2005) (affirming the judgments of convictions of Santiago and Williams). Santiago was convicted on three counts and sentenced to a term of imprisonment of 840 months. The jury was unable to reach a verdict on the two counts on which Agostini was indicted: participating in a narcotics conspiracy and assault in aid of racketeering. Following a retrial, Agostini was convicted of these charges and sentenced to a term of imprisonment of 300 months. *See United States v. Agostini,* 365 F.Supp.2d 530 (S.D.N.Y.2005).

ing organization (Count One), but failed to specify the required finding of at least two of the predicate acts of racketeering with which Williams was charged, thus compelling a dismissal of that verdict. *See Santiago*, 214 F.Supp.2d at 425. The jury was unable to reach a verdict on three other counts on which Williams was separately indicted: attempted murder in aid of racketeering (Count Four), murder in aid of racketeering (Count Five), and murder in connection with a major drug organization (Count Seven). Count Four charged Williams in connection with the shooting of a patron (Francisco Martinez ("Martinez")) of a night club operated by Santiago where Williams worked as a bouncer. Counts Five and Seven related to the killing of an individual identified as a drug addict named Alan McLeod ("McLeod"). The jury also did not reach agreement concerning the precise quantity of drugs involved in the conspiracy.

On the appeal by Williams and Santiago of their convictions and sentencings, the United States Court of Appeals for the Second Circuit affirmed this Court's judgments but, in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), remanded the case to this Court for further sentencing proceedings in conformity with *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005). *See Santiago*, 126 Fed. Appx. 21, 23–24 (2d Cir.2005). Williams then filed the instant motion for resentencing pursuant to *Crosby*. The Government opposed the motion.

## II. INTRODUCTION

The duties of the law at times present the courts unique occasions that require them to pause and ponder turning points which seem drawn from the stuff of fiction and other fantasy. At those weighty moments, judges sometimes come upon real encounters with a common musing many of us indulge: if we were able to turn the clock back to a given crossroad in life, and had the chance to reconsider a particular action then taken and to do it over again, what course would we pursue—reaffirm or disavow? Would we endorse the previous choice as wisely made, or instead use the moment to do something different? Would we chart another route, or employ distinct means so as to achieve a better end, undo revealed mistakes or roll back regrets?

The notion of going "back to the future," to see how events might unfold differently if new contingencies opened up and the mix of life's variables were altered at the point where paths diverge, has inspired the fancies of film makers and poets alike, as in the ambiguous might-have-beens that haunt Frost's road not taken, or the ringing affirmance of Yeats's voice proclaiming to be "content to live it all again /And yet again...."[2] In a real sense, rather than as mere poetic imagination, something akin to that rare opportunity to rewind the tape and play it again is reflected in the challenge *Booker* and *Crosby* pose to judges in some cases.

Sentencing experience prior to *Booker* records the rueful qualms frequently articulated by courts deploring the harsh sentences they felt compelled to impose under the Sentencing Guidelines in particular cases,[3] punishment much more rigorous

---

**2.** Robert Frost, *The Road Not Taken* (1916), *reprinted in The Poetry of Robert Frost: The Collected Poems, Complete and Unabridged,* at 105 (Edward Connery Lathem ed., 1969); William Butler Yeats, *A Dialogue of Soul and Self* (1929), *reprinted in Selected Poems and*

*Two Plays of William Butler Yeats,* at 123, 125 (M.L. Rosenthal ed., 1962).

**3.** *See, e.g., United States v. Charvat,* No. 00 Cr. 91–05, 2002 WL 31426014, at *1 (S.D.N.Y. Oct.28, 2002) (noting, in a case involving dif-

than they otherwise wanted to authorize, except that "the Guidelines made me do it." In some instances, these judges went even further, actually stating on the record the sentence they would have pronounced but for the strictures of the Guidelines.[4] With the lamentations about such judicial handcuffing and hand-wringing as a backdrop, *Booker* was hailed as the great liberator of sentencing courts, a means for them to remedy some of the severity and penal anomalies, perceived and real, the Guidelines had engendered. As in the instant case, with regard to defendants who availed themselves of *Booker's* potential grace, that new freedom offered the court a unique form of reprieve as well, a chance to return to the scene of the original sentencing and reopen a judgment already rendered—to decide again how it would have decided in the light of the new sentencing regime. For, in *Crosby*, the Second Circuit remanded to the district courts all cases such as Williams's whose appeals were still pending prior to *Booker*, for sentencing reconsideration taking into account the currently applicable statutory requirements as explained in *Booker* and *Crosby*. The Court of Appeals directed the district

courts to hear both sides address any aggravating or mitigating considerations that the judges could not properly weigh before *Booker*, and to determine, based solely on the circumstances that existed at the time of the original sentence, *"whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." *Crosby*, 397 F.3d at 117 (emphasis in original).

A *Crosby* remand thus lays a heavy task upon the sentencing court. It requires the Court, supplied with knowledge and freedom it lacked before and which the future has now imparted, to look back and reassess a prior sentencing choice. To that extent, the charge is as exacting as it is unique, a challenge made even heavier in a case such as this by the defendant's ardent plea for the Court to use the moment and its newly conferred discretion to temper justice with mercy. So framed, the mission essentially calls upon the Court not only to search the sentencing record but to search its soul as well. In that spirit, this Court acknowledges that a rare-in-a-lifetime opportunity to reexamine and potentially alter any lingering doubt a past course of action may have stirred is not a challenge that can be treated lightly.

---

ferences among co-conspirators' sentences, that "[t]he instant case is . . . a classic demonstration of the disparities and inequalities that result in the individual case from mechanistic application of the guidelines"); *United States v. Gochis*, 169 F.Supp.2d 918, 922–23 (N.D.Ill.2001) (reviewing the reluctant sentencing guidelines decision of a magistrate judge, who stated: "Had I discretion, I would have given the defendant between three to six months. I regret not having been able to find additional grounds for an even greater departure than I made."); *United States v. Molina*, 963 F.Supp. 213, 215 (E.D.N.Y.1997) (comparing harshness of federal guidelines to the practice of Procrustes, "the rigid and cruel innkeeper," who placed every visitor to his inn upon an iron bed, and stretched the short guests and cut off as much as was necessary from the tall "in order to make one bed fit all"); *United States v. Khalife*, 954 F.Supp.

1168, 1171 (E.D.Mich.1997) (noting, in habeas review of sentencing, that the Guidelines range "results in the Court being obligated to impose a sentence greater than the Court believes is appropriate, and greater than the Court would impose, but for the constraint of the guidelines").

4. *See e.g., United States v. Foster*, No.Crim. A. 98–126, 1999 WL 615630, at *1 (E.D.Pa. Aug.12, 1999) (noting, in habeas review of sentencing, that court had stated on the record during sentencing proceeding: "I will tell you, Mr. Foster, that if it weren't for the Federal Sentencing Guidelines, I would arrange at least for your sentence to be concurrent and not consecutive. I have no choice about that. Congress has decided to remove a great deal of the discretion of the Judges.").

Viewed in its proper context, combining as it does the ample judicial latitude *Booker* has enlarged, and consequentially the prospects for more just sentences that the new system promises, a court's determination to reaffirm a sentence previously imposed, particularly one entailing punishment as severe as that which Williams received under the regime of the mandatory Guidelines, takes on special import and added dimensions. Such a decision would be notable and telling. Understandably, it would invite questions and a fuller explanation. In effect, the court's ruling on remand would convey that despite the dramatic shaking and shifting of the ground and the lifting of the imperatives that supported the original sentence, the court has remained unmoved by the defendant's new entreaty. But, as this Court's experience in this case can attest, by no means should that ultimate result be read to suggest that the Court's earlier deliberations were easy, or that upon review the job turned out any lighter. Few choices in life can boast that grade of infallibility.

■ Consequently, in charting a proper approach to the mandate before it, the Court first notes and rejects the obvious. Whether blithe or heroic, an uncritical perfect contentment to do everything all over again precisely the same way would not do justice to the Court's immediate task, nor be equal to the fulfillment of its larger duties. Such smugness would only border on monumental hubris. However, like a judge's reasonable doubt instruction to a jury in a criminal case, what the *Crosby* remand calls for in the end as regards a denial of a resentencing is not absolute identity as to the underlying sentencing results. It does not demand that upon reexamination of the original sentence in the light of *Booker*'s liberating spirit the whole constellation of relevant circumstances realign to reflect an unwavering mirror image of the same analysis and the sentence imposed. Arguably, in any reappraisal of the same events through the prism of altered considerations, if in the final analysis the outcome is more or less the same, some slight fluttering at the edges of the scales is not unusual, nor does it constitute sufficient ground to discard the weighing or declare that a substantially different reading is justified. This Court could not candidly insist that, after the variables changed to remove a statutory command that largely shaped an outcome Williams urges was unjust, nothing called to the Court's attention by Williams's application stirred any sympathetic impulse. Nonetheless, as the Court interprets its charge, it is to assess whether, even if the Court discerned any differences in the sentencing analysis after applying all of the considerations now relevant and gave them permissible expression, any supportable change in the reexamined sentence would rank as immaterial, or, in the Second Circuit's curious phrase, "nontrivially different." *Crosby*, 397 F.3d at 118.

Under the standard articulated here, and for the reasons detailed below, the Court is satisfied that it has fairly fulfilled its task in this case. After weighing the mitigating and aggravating circumstances the parties have presented in connection with Williams's instant application, and reexamining its original sentencing decision of Williams in the light of *Booker* and *Crosby*, the Court concludes that this is not a case in which the altered sentencing regime *Booker* occasioned sufficiently compels undoing what the Court did the first time around. Accordingly, the Court denies Williams's motion.

## III. DISCUSSION

### A. SENTENCING CONSIDERATIONS

Williams maintains that his sentence warrants substantial reduction. In sup-

port of this contention he raises three points: (1) that a post-*Booker* Sentencing Guidelines calculation would produce a lower Guidelines range by reason of now impermissible enhancements the Court adopted that the Government did not prove at trial before the jury beyond a reasonable doubt, but were grounded on facts determined by the Court; (2) that the Court should not impose consecutive sentences for the two counts of which Williams was convicted; and (3) that application of all the sentencing considerations enumerated in 18 U.S.C. § 3553(a) (" § 3553(a)"), under which *Booker* now allows the Court to more fully consider Williams's personal characteristics, would significantly lower his sentence. The Court rejects these grounds as sufficient justifications for resentencing in this case.

At the time of sentencing, Williams faced a custodial sentence that, under two alternative applications of the Guidelines that the Court considered, would have ranged from 360 months to life imprisonment according to one computation and to life under the other. The Probation Office's Presentence Investigation Report ("PSR") produced a Guidelines range of life imprisonment and recommended a sentence of 600 months. The Court sentenced Williams to 600 months, which equates to the statutory maximum term for Counts Two and Three, run consecutively. In deciding to impose consecutive sentences, the Court took into account U.S.S.G. § 5G1.2(d), which provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."

In ruling on Williams's instant motion, and determining whether resentencing is warranted, the Court weighed not only the nature and circumstances of Williams's offense and his family history and personal characteristics as described in the PSR and Williams's submission, but also the Guidelines and the various other sentencing criteria enumerated in § 3553(a), requiring that the Court consider, among other factors: (1) the need for the sentence imposed to (a) "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense;" (b) "afford adequate deterrence to criminal conduct;" (c) "protect the public from further crimes of the defendant;" and (d) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (2) the kinds of sentences and the sentencing range established for the category of offense and defendant as set forth in the Guidelines; and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been convicted of similar conduct. 18 U.S.C. § 3553(a).

In this regard, the Court considered as significantly bearing on its ultimate determination several aggravating factors which it found the trial record established by clear and convincing evidence, or at minimum by a preponderance of the evidence. Among other circumstances, the Court took into account: the gravity of the crimes of which Williams was convicted, and his high degree of culpability in those offenses, in that he was a manager and "enforcer" of the drug gang involved in the conspiracies, a role that entailed acts of extreme violence, including Williams's firing a gun at and twice wounding Martinez in the back while pursuing him following a fight in the after-hours club where Williams worked for Santiago as a bounc-

er, and his stabbing of McLeod to death, purportedly for having failed to pay Williams a drug debt of about $100; the substantial amount of unlawful drugs involved in the organization's narcotics trafficking, of which the Court concluded Williams was directly responsible for at least 50 but less than 150 grams of cocaine base, even though the PSR calculated the amounts attributable to Williams to be in excess of 1.5 kilograms of crack; Williams's possession and use of firearms during the course of the conspiracy; Williams's extensive prior criminal record, which qualified him as a "career offender" and which included several convictions for crimes involving the sale of controlled substances.

These circumstances did not present the Court a situation prompting an expression of profound doubt or concern—as other courts had been moved to do by particular applications of the Guidelines—that the sentence the Guidelines analysis yielded was excessively harsh, thus justifying a different outcome upon the Court's reexamination of what it did during the original sentencing. To the contrary, what the Court encountered in this review con-

firmed the need for an appropriate application of § 3553(a), including the Guidelines, that produced a sentence sufficiently enhanced to reflect the severity and "real conduct" Williams's crimes embodied. *Booker*, 125 S.Ct. at 757.

In connection with the instant remand, the Court has reviewed, in light of *Booker* and *Crosby* and as comprising the circumstances before the Court at the time of Williams's original sentencing, all of the preceding considerations and other facts derived from Williams's trial and from his PSR, as well as the sentencing range recommended by the Guidelines. On the basis of that assessment, the Court finds that the sentence of 600 months the Court imposed on Williams was reasonable, in that it was and continues to be "sufficient, but not greater than necessary" to comply with the sentencing purposes articulated in § 3553(a). A sentence of 360 months in connection with Williams's narcotics conspiracy conviction, given his major role in the organization, his acts of extreme violence and his extensive criminal history, was not out of line relative to sentencings of comparable offenses and offenders weighed by the Court.[5] By the same to-

---

**5.** On this note, the Court has considered Williams's reference to the 300–month sentence imposed on Agostini, post-*Booker*, as suggesting disparities among the sentences of Williams's co-defendants, in view of the Court's endeavor to achieve a measure of proportionality in these sentences. In fashioning Agostini's sentence and considering Williams's argument, the Court finds that the characteristics of the two defendants and their crimes are not sufficiently comparable to support Williams's argument for a maximum concurrent sentence of 30 years on this basis. Williams's relevant conduct was far more severe in its violence, which included his possession and use of a knife and guns on more than one occasion. He had a far greater role as a leader of the drug gang and his criminal history rendered him a career offender. In contrast, Agostini, however vicious his knife assault on Paul Crowder, did

not actually kill his victim; he was a junior member of the conspiracy seeking acceptance into the gang, and had only a relatively minor prior criminal history, as the Court, rejecting the Government's argument, specifically found. *See Agostini*, 365 F.Supp.2d at 539. These sentences must also be weighed in the context of those imposed upon several other co-defendants in this case who accepted responsibility and pled guilty, and whose sentences under the Guidelines, all rendered at the low end of the scale, ranged from 144 to 210 months for those who were the most serious offenders, even though their crimes of conviction did not include or relate to conduct involving assault with a dangerous weapon or homicide. In addition, the sentence Williams proposes would be significantly disproportionate to the 840 months imposed on Santiago, the leader of the gang whose crimes, role in the enterprise and prior crimi-

ken, the 240–month sentence imposed in connection with Williams's racketeering conspiracy conviction was not inconsistent with punishment for similar crimes involving the extreme violence and use of firearms that characterized Williams's conduct. That Williams's offenses involved the entirely unprovoked killing of one person and a serious attempt on the life of another supplied sufficient justification for the Court to find that running Williams's multiple counts of conviction consecutively was necessary, as authorized by U.S.S.G. § 5G1.2(d), to produce a combined sentence equal to the extent of the total punishment. A concurrent sentence under these circumstances would not have sufficiently reflected in their entirety the seriousness of Williams's offenses, his criminal history, deterrence of Williams and other potential offenders, and the need to protect the public from other crimes Williams might otherwise commit. Thus, the Court concludes that had it applied the sentencing rules enunciated in *Booker* at the time of the original sentencing, it would not have imposed a "nontrivially different sentence" on Williams. *Crosby,* 397 F.3d at 118.

## B. *WILLIAMS'S OBJECTIONS*

Williams argues, however, that the Sentencing Guidelines calculation the Court employed was fundamentally flawed in that it considered enhancements not permissible in light of *Booker.* Specifically, Williams contends that the analysis of the offense level under the Guidelines with regard to the drug quantities involved in the conspiracy and attributable to Williams; his managerial role in the narcotics organization; his possession of a firearm in connection with the criminal organization's activities; and his killing of McLeod and attempted murder of Mar-

tinez, conduct as to which Williams contends the jury verdict represents an acquittal on each of three underlying counts—all, contrary to *Booker,* entailed facts determined by the Court by a preponderance of the evidence based on the trial record and the PSR, and therefore neither admitted by Williams nor found by a jury beyond a reasonable doubt.

As Williams acknowledges, in *Agostini* this Court, post-*Booker,* considered and addressed the issues concerning sentencing enhancements based on circumstances found by the Court by a preponderance of the evidence, uncharged or acquitted conduct, and consecutive rather than concurrent sentencing. *See* 365 F.Supp.2d at 533–39, 541. Contending that these questions have not been decisively resolved post-*Booker,* Williams invites the Court to reconsider its rulings in *Agostini,* on the authority of other courts that have reached contrary results with regard to some of these issues. *See, e.g., United States v. Ameline,* 400 F.3d 646 (9th Cir.2005) (finding defendant's sentence violated *Booker* by reason of enhancements applied by the district court based on factfinding by the judge beyond facts the defendant admitted in his plea); *United States v. Oliver,* 397 F.3d 369 (6th Cir.2005) (same); *United States v. Hughes,* 396 F.3d 374 (4th Cir. 2005); *see also United States v. Coleman,* 370 F.Supp.2d 661, 669 (S.D.Ohio 2005) (noting, as regards enhancements for acquitted conduct, that "[t]he viability of *Watts* … was questioned by … [the] constitutional majority opinion in *Booker*"); *United States v. Pimental,* 367 F.Supp.2d 143, 150 (D.Mass.2005) (noting that *Booker* "substantially undermines the continued vitality of *United States v. Watts* both by its logic and by its words"); *see*

nal history Williams's characteristics more closely resembled.

*also United States v. Gray,* 362 F.Supp.2d 714, 721 (S.D.W.Va.2005).

The Court is mindful that considerable judicial disagreement still prevails concerning these critical matters. However, the Court has also weighed supporting reasoning and precedents, which Williams overlooks, that it considers more compelling. Below, the Court addresses the underlying issues in turn.

### 1. *Enhancements Based on Judicial Factfinding*

■ With regard to sentencing enhancements grounded on judicial factfinding, both facets of the *Booker* holdings recognize that, absent the mandatory strictures of the Sentencing Guidelines, the constitutional issues that prompted the Supreme Court's invalidation and excision of those provisions would vanish. Addressing this point, Justice Stevens's majority opinion deciding the constitutional issues declares that "everyone agrees" that if the Guidelines were considered merely advisory rules that recommended, rather compelled, the imposition of particular sentences corresponding to differing facts, their application would not raise Sixth Amendment barriers, "[f]or when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." 125 S.Ct. at 750. In a similar vein, Justice Breyer's majority remedial opinion acknowledges that without the provision that makes the Guidelines mandatory and imposes binding requirements on all sentencing judges, "the statute falls outside the scope of *Apprendi'*s requirement." *Id.* at 764. Thus, a fair reading of the Supreme Court's unified position on this point does not compel that sentencing enhancements based on findings determined by the court, rather than on facts author-

ized by a jury verdict or admitted by the defendant, are categorically invalid or suspect. *See id.* at 775 (Stevens, J., dissenting) ("[E]ven in those trials in which the Guidelines require the finding of facts not alleged in the indictment, such factfinding by a judge is not unconstitutional *per se* .... [O]ur holding [in the *Booker* constitutional opinion] that *Blakely* applies to the Guidelines does not establish the 'impermissibility of judicial factfinding.' ") (citations omitted). Instead, *Booker* instructs that such enlarged penalties offend constitutional standards when they rest on binding factual determinations that judges are mandated to make in respect of particular aspects of the defendant's relevant conduct. *See id.* at 750.

In *Crosby* the Second Circuit so construed *Booker.* Noting that by application of *Booker'*s remedial holding the maximum lawful punishment is the statutory maximum sentence and that because under an advisory guidelines regime that authorized maximum cannot be increased on the basis of facts determined by the trial court, the Circuit Court declared that "the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection." 397 F.3d at 112. Moreover, the *Crosby* Court went on to reaffirm that "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* On this basis, the Circuit Court further instructed that "a sentencing judge would also violate section 3553(a) by limiting consideration of the applicable Guidelines range to the facts found by the jury or admitted by the defendant, instead of considering the applicable Guidelines range ... based on facts found by the court." *Id.* at 115; *see also United States v. Garcia,* 413 F.3d 201, 220 n. 15 (2d

Cir.2005) (declaring that "[j]udicial authority to find facts relevant to sentencing by a preponderance of the evidence survives *Booker*"); *United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir.2005) (stating that the sentencing court retains the "authority—that endures post-*Booker*—to resolve disputed facts by a preponderance of the evidence when arriving at a Guidelines sentence"); *United States v. Duncan*, 400 F.3d 1297, 1302 (11th Cir.2005) (noting that " '[t]he error that was committed in pre-*Booker* sentencing ... is not that there were extra-verdict enhancements ... [but] that there were extra-verdict enhancements used in a mandatory guidelines system' ") (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1300 (11th Cir. 2005)); *United States v. Williams*, 399 F.3d 450, 458 (2d Cir.2005) ("We agree that the Sixth Amendment error is the mandatory use of the Guidelines enhancement, not the fact of the enhancement.").

On the basis of the preceding authority the Court rejects Williams's objections to the Court's consideration of circumstances determined by judicial factfinding in formulating an appropriate sentence for Williams.

### 2. *Consecutive vs. Concurrent Sentences*

In response to Williams's objection to the Court's imposition of consecutive rather than concurrent sentences, the Court notes that in affirming the judgments of conviction of Santiago and Williams, the Second Circuit endorsed this Court's observation that "there is no constitutional right to concurrent, rather than consecutive, sentences." *Santiago*, 126 Fed.Appx. at 24; *see United States v. White*, 240 F.3d 127, 135 (2d Cir.2001) ("[W]e are aware of no constitutionally cognizable right to concurrent, rather than consecutive, sentences.... 'The presumption when Con-

gress creates ... distinct offenses is that it intends to permit cumulative sentences ....' ") (quoting *Garrett v. United States*, 471 U.S. 773, 793, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985)); *see also United States v. Blount*, 291 F.3d 201, 213–14 (2d Cir.2002). Upon review of Williams's sentencing in the light of *Booker*, the Court concludes that, for the reasons described in this opinion, it would have imposed consecutive sentences in connection with Williams's offenses even if such a result were not mandated by the Guidelines.

### 3. *Acquitted Conduct*

Finally, Williams places great emphasis on the jury's failure to return a verdict on the three counts that involved Williams's alleged murder of McLeod and attempted murder of Martinez. For that reason, he argues strenuously that those bad acts should not have entered in any way into the Court's consideration of the relevant conduct it took into account in determining his total sentence. Williams's heavy reliance on this point prompts the Court to add some observations further addressing the fundamental issues raised by such enhancements.

The charges the Government brought against Williams relating to McLeod's death accused Williams of murdering McLeod in aid of racketeering or in connection with a major drug organization. At trial, the Government presented the testimony of several eyewitnesses (not all of them cooperators) who had familiarity with Williams and McLeod and attested to Williams's stabbing of McLeod to death in front of them. Their accounts of the incident were uniformly consistent in all material details. Testimony from a representative of the City's Medical Examiner's office established that McLeod died from the stab wounds to the chest that were inflicted upon him at the time and place the

witnesses described. With regard to the attempted murder of Martinez, the count similarly charged that Williams committed that offense in aid of racketeering. Martinez himself testified at trial. He gave a description of his assailant that matched Williams's physical characteristics. Other witnesses also placed Williams at the scene and implicated him in the shooting.

In assessing the relevance of these instances of Williams's extreme violence in connection with determining an appropriate sentence, the Court considered the doctrine enunciated in *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam). There, the Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157, 117 S.Ct. 633; *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 n. 19, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("A sentencing judge may even consider past criminal behavior which did not result in a conviction...."); *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *United States v. Magallanez*, 408 F.3d 672, 684–85 & n. 1 (10th Cir.2005) (noting that nothing in *Booker* changes *Watts*'s analysis of 18 U.S.C. § 3661, which underlay the *Watts* Court's decision, and that the text of *Booker* "demonstrates that *Watts* remains good law").

The Court has taken account of the doubts other courts have voiced concerning the continuing authority of *Watts* in the light of *Booker*. *See, e.g., Coleman*, 370 F.Supp.2d at 671–73; *Pimental*, 367 F.Supp.2d at 150. To be sure, *Booker* itself raises some ambiguities on this score. In the majority's constitutional opinion Justice Stevens discussed several prior Supreme Court cases, including

*Watts*, and remarked that "[n]one of our prior cases is inconsistent with today's decision." 125 S.Ct. at 754. However, he qualified that statement somewhat by noting that *Watts* entailed "a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause," and thus did not present an occasion for the Supreme Court to consider the precise issues raised in *Booker*, specifically whether "the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment." *Id.*

At the same time, the majority's remedial opinion, as discussed above, effectively reaffirmed judicial authority under an advisory guidelines system to determine facts and relevant conduct that may properly inform a court's sentencing decision. On this point, Justice Breyer's majority remedial decision specifically rejected the approach advocated by Justice Stevens's dissent pertaining to the remedy, which would have engrafted onto the mandatory Guidelines system the jury trial requirement compelled by the majority's constitutional opinion. Among the reasons Justice Breyer cited for declining to follow that course was that it would "alter the judge's role in sentencing." *Id.* at 758. Instead, the remedial opinion stressed that the solution adopted by the remedy majority in rendering the Guidelines advisory by severing the offending mandatory provisions would "maintain[ ] a strong connection between the sentence imposed and the offender's *real conduct*—a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." *Id.* at 757 (emphasis added).

Whatever ambiguities may emerge from *Booker* concerning the permissible scope of judicial factfinding, and despite any implications doubts arising from those uncer-

tainties may have for the doctrine of *Watts,* the issues cannot be resolved by invoking the *Booker* constitutional opinion while ignoring the equally germane instruction of the case's remedial holding. *See Booker,* 125 S.Ct. at 769 (noting that in all cases on direct appellate review "[w]e must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act"); *United States v. Vaughn,* 430 F.3d 518, 524 (2d Cir.2005) (noting that the *Booker* Court "expressly stated that both holdings should be applied to then-pending cases on direct review"). In the final analysis, the necessary interplay between *Booker's* two rulings has persuaded other courts that have addressed these questions to conclude that *Booker* does not alter the judicial factfinding authority enunciated in *Watts.* In *Vaughn,* the Second Circuit, noting that it did not read *Booker* "to undermine the continued validity of the ruling in *Watts,*" counseled that district courts may find facts relevant to sentencing by a preponderance of the evidence "where the jury acquitted the defendant of that conduct," as long as the sentence imposed (1) is not grounded on the belief that the Guidelines are mandatory, (2) does not exceed the statutory maximum authorized by the jury verdict, or (3) is not a mandatory minimum under 18 U.S.C. § 841(b) not authorized by the verdict. 430 F.3d at 526, 528. *See United States v. Price,* 418 F.3d 771, 788 (7th Cir.2005); *Magallanez,* 408 F.3d at 684–85 & n. 1; *Duncan,* 400 F.3d at 1304 ("*Booker* does not suggest that the consideration of acquitted conduct violates the Sixth Amendment as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict."); *see also Williams,* 399 F.3d at 454.

The Court recognizes the apparent anomaly, which has so profoundly troubled other judges, entailed in an enhancement of punishment for a crime of conviction based on the court's reliance on facts relating to other charges as to which the jury presumably acquitted the defendant or failed to reach a verdict. *See, e.g., Pimental,* 367 F.Supp.2d at 150 ("It makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts essential to sentencing have been determined by a judge rather than a jury and *also* conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing.") (citation omitted) (emphasis in original). This concern is quite understandable and perhaps in some narrowly defined circumstances may even be compelling.

The paradox, and possibly its resolution, is rooted in the vagueness and potential over-inclusiveness embodied in the concept of "acquitted conduct." Not unexpectedly, Williams and other defendants in cases implicating such judicial factfinding take issue with any sentencing enhancement grounded on purported acquitted conduct because they deem the jury's verdict as being a factually open-ended and all-encompassing determination of innocence. In other words, they read into a jury acquittal or failure to convict a complete and absolute exculpation of the accused of all involvement in any aspect of the offense charged. In this view, that absolution would necessarily negate any factual predicate associated with the acquitted charge, so as to categorically bar its consideration by the court in connection with the defendant's sentencing on a conviction determined at the same trial on a related charge. In some circumstances, such an interpretation of the meaning of a jury verdict and of the limitations on its use may be unduly rigid and overly broad. The misapprehension derives in part from a failure to properly distinguish between the narrowly defined elements of an of-

fense specifically prescribed by statute, and the much broader compass of pertinent facts and circumstances that permissibly inform and guide sentencing decisions. *See Vaughn,* 430 F.3d at 526. As the Second Circuit noted in *Vaughn,* "Elements of an offense must be tried to a jury, but facts relevant to sentencing may be found by a judge, within the constraints of the Sixth Amendment." *Id.*

*Watts* itself is instructive on this point. There, the defendant was arrested after the police found cocaine in a kitchen cabinet and guns and ammunition in a bedroom closet of his house. Two charges were brought against him: possessing cocaine with intent to distribute and using a firearm in relation to a drug offense. A jury convicted Watts on the narcotics charge but acquitted him of using a firearm in connection with the drug crime. At sentencing, the court, applying the Guidelines, enhanced by two points Watts's base offense level after finding by a preponderance of the evidence that Watts had possessed the guns. That determination apparently reflected the Government's argument that, unlike the factual predicates of the firearms offense of which Watts was acquitted, the court's sentencing enhancement did not require a connection between the gun and drug crime of conviction. The Circuit Court vacated the sentence, finding it impermissible for the judge, with regard to sentencing on a related conviction, to "reconsider" facts that the jury "necessarily rejected" by acquitting the defendant on another count. 519 U.S. at 150, 117 S.Ct. 633.

Reversing the Ninth Circuit's ruling, the Supreme Court noted that, pre-Guidelines, it was " 'well established that a sentencing judge may take into account facts introduced at trial *relating to* other charges, even ones of which the defendant has been acquitted,' " and that the Guidelines did

not alter this aspect of the sentencing court's discretion. *Id.* at 152, 117 S.Ct. 633 (quoting *United States v. Donelson,* 695 F.2d 583, 590 (D.C.Cir.1982) (Scalia, J.)) (emphasis added). Thus, implicitly, while the jury acquitted Watts of *using* a firearm in relation to a narcotics offense, which was the precise crime the indictment specifically charged, that verdict did not necessarily foreclose a judicial finding by a preponderance of the evidence that the defendant had *possessed* the guns in question, a circumstance certainly relevant to sentencing considerations such as the danger Watts posed to society and the need to protect the public from other crimes he might commit. Under these circumstances, what actually constitutes the "acquitted conduct" that arguably a court should not consider in weighing a sentence on a related count? Certainly, the term would extend to the precise scope of acts encompassed by the full statutory elements of the crime as charged in the indictment: using a gun in relation to a drug offense. But should a negative verdict as to that formulation of the offense necessarily preclude a court's finding of the defendant's possession of the firearm? Strictly speaking, even if the jury believed beyond reasonable doubt that Watts had not *used* a gun in relation to the drug crime of conviction, the evidence nonetheless could have supported a court's determination by a preponderance of the evidence that he *possessed* the weapon, whether or not connected with the narcotics offense. On this narrower view, possession of the firearm by itself did not itself constitute the acquitted conduct, though it certainly *related* to the other charge on which the jury found the defendant guilty. Nor is a court's weighing of that aspect of a defendant's conduct in deciding an appropriate sentence for the crime of conviction, where the judge has heard at the trial and can thus assess the sufficiency of the evidence,

much different from its consideration, as courts traditionally have done, of other forms of aggravating circumstances presented in the presentencing reports.

As the Supreme Court noted in *Watts,* it is impossible to know exactly why a jury found a defendant not guilty of a certain charge, and accordingly "the jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." 519 U.S. at 155, 117 S.Ct. 633. Therefore, " '[a]n acquittal is not a finding of any fact.' " *Id.* (quoting *United States v. Putra,* 78 F.3d 1386, 1394 (9th Cir.1996) (Wallace, C.J., dissenting)). This observation is even more apt, as in the instant case, where the jury, rather than acquitting, is unable to reach a verdict on a particular count.

■ On the basis of the preceding analysis the Court is persuaded that there is no clear and controlling authority in *Booker,* or in the cases interpreting and applying its dual holdings, that would bar the Court from taking into account Williams's conduct in the death of McLeod, and in other acts of violence supported at trial by a preponderance of the evidence, as relevant aggravating considerations in determining the length of the appropriate sentences to impose in connection with Williams's crimes of conviction or in deciding that the totality of the circumstances pertaining to those offenses warranted consecutive rather than concurrent sentences.

Given the specific accusations Williams faced with regard to McLeod's death, which required a connection of McLeod's murder to Williams's involvement in racketeering or narcotics offenses, that the jury did not convict him on those counts does not necessarily equate to an affirmative finding that the stabbing of McLeod to death did not happen as recounted by the eyewitnesses, or that McLeod did not die from those as opposed to other wounds, or that Williams had no causal role whatsoever in McLeod's demise. Arguably, the outcome could have had more to do with the jury's inability to agree on any one of the numerous other elements that determine whether or not the killing occurred in relation to Williams's involvement in racketeering or in a major narcotics organization—as opposed to, for example, the result of an unrelated personal feud with McLeod. It is conceivable that the jury could have harbored a reasonable doubt as regards those other requirements of the offense, and even that the record may not have supported such a finding by a preponderance of the evidence. But that is not to say that on this account the Court should be obligated to shut its eyes and ears to substantial evidence it heard bearing materially on the defendant's character, propensity for violence and the "real conduct" pertaining to his crimes of conviction. *Booker,* 125 S.Ct. at 757. Hence, for sentencing purposes the Court should not be precluded from considering a finding that Williams, whatever his motives for the conduct, did slay McLeod.[6]

**6.** It is also conceivable that in connection with a hypothetical murder charge as to which the factual predicates require a finding that the defendant's conduct was premeditated, and the principal theory of the defense is that the evidence did not sufficiently establish such deliberate conduct, a jury could have a reasonable doubt supporting an acquittal on an accusation of intentional killing. Yet, in connection with sentencing on a related

charge on which the accused was convicted at the same trial, for instance, robbery of the victim, such a finding would not necessarily be inconsistent with a determination by a preponderance of the evidence that the defendant had committed an act of homicide, such as manslaughter, even if that lesser offense was not formally charged. This situation would implicate the interaction between the judge's factfinding for sentencing purposes

In the final analysis, however, because of the secrecy that surrounds jury deliberations, such speculation may not serve an entirely productive purpose. Instead, what is particularly relevant, and what longstanding doctrine reaffirmed by the Supreme Court in *Watts* recognizes, is that, for the purposes of imposing an appropriate sentence: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider...." 18 U.S.C. § 3661. Consistent with this Congressional mandate, the Guidelines Commission prescribed that the courts can take into account "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." United States Sentencing Commission, Guidelines Manual § 1B1.3(a)(2); *see Watts*, 519 U.S. at 153, 117 S.Ct. 633. Accordingly, as the *Watts* Court noted, "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction." 519 U.S. at 154, 117 S.Ct. 633 (citing *Witte v. United States*, 515 U.S. 389, 402–03, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)). All information regarding such conduct is relevant, and thus should not be barred from the sentencing court's purview, in part by reason of the different standards of proof that traditionally govern the jury's verdict at a criminal trial and the judge's determination of a just punishment during sentencing proceedings. *See id.* at 155, 117 S.Ct. 633; *Magallanez*, 408 F.3d at 684.

■ Here, whatever the deficiencies that may have imbued the Government's

evidence and failed to establish an essential element of the racketeering and narcotics charges against Williams encompassing the murder of McLeod and the attempted murder of Martinez, or that may otherwise have raised a reasonable doubt in the jury's mind as to whether the Government had met its burden of proof warranting a guilty verdict on the crimes specifically charged, the Court was persuaded that the preponderance of the evidence supported its finding concerning Williams's relevant conduct in this regard for the purposes of sentencing. In particular, whether or not Williams's behavior may have satisfied other specific prerequisites of the crimes for which the jury did not reach a verdict, sufficient evidence indicated that Williams twice shot Martinez in the back, and that he did inflict several fatal knife wounds on McLeod, the last of which Williams administered after McLeod had fled from him and was already lying prone on the ground as a result of the first stab.

Even if Williams's acts pertaining to the shooting of Martinez and the killing of McLeod would not have satisfied the elements of any of the specific crimes charged as to those acts, at minimum the incidents bolstered a sufficient finding from the overall sentencing record that Williams was a violent individual who engaged in vicious conduct related to the offenses of which he was convicted, that his crimes were all the more severe on that account, that for these reasons he posed a graver danger to society, and that his transgressions thus warranted enhanced punishment within the statutory maximums authorized.

Such assessment, quite distinct from the Court specifically grounding any enhance-

and the Double Jeopardy Clause that the Supreme Court considered in *Watts*. *See* 519

U.S. at 154–55, 117 S.Ct. 633.

ment upon any particular charge concerning which the jury acquitted or failed to return a verdict, entails weighing aggravating considerations of the type that typically enter into a court's decision as to where within the statutorily prescribed sentencing range an appropriate punishment should be imposed. Accordingly, upon consideration of all the circumstances prevailing at the time of Williams's original sentencing, the Court concludes that, because of the manner in which Williams committed the narcotics and racketeering conspiracies that constituted the offenses of which he was convicted, *see Watts*, 519 U.S. at 154, 117 S.Ct. 633, such aggravating circumstances could enhance Williams's sentencing, within the range of imprisonment provided by the Guidelines and applicable statutory maximum penalties.

Thus, even under an advisory Guidelines regime, the Court would be free to consider the aggravating conduct described in Williams's PSR, and the sentencing enhancements it adopted in this case, taking into account circumstances established by a preponderance of the evidence. On that basis the Court determines, pursuant to § 3553(a), that the same range of incarceration as that generated by the Guidelines would be authorized as a basis for a reasonable sentence here. Furthermore, bearing in mind such aggravating circumstances, as detailed above, the Court concludes that even if initially the permissible sentencing range under a mandatory guidelines scheme had been lower after consideration of any adjustments or downward departures warranted under the Guidelines, upon reconsideration the Court would not have imposed a materially different sentence under the sentencing regime outlined in *Booker*. The Court finds that the sentence originally imposed was reasonable in that it was sufficient, but not greater than necessary to achieve the sen-

tencing objectives set forth in § 3553(a), after appropriate weighing of the relevant factors enumerated there, including the Sentencing Guidelines. Williams has not persuaded the Court that the sentence originally imposed upon him would have been "nontrivially different" had the Court understood the Guidelines to be only advisory at the time of his original sentencing. *Crosby*, 397 F.3d at 118.

## ORDER

For the reasons set forth above, Williams's request for resentencing is DENIED.

**SO ORDERED.**